10.678.02

No. 21-71426

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## BACKCOUNTRY AGAINST DUMPS, et al.,

### Petitioners,

v.

## FEDERAL AVIATION ADMINISTRATION, et al.,

### Respondents.

---

## ON PETITIONERS' ORIGINAL PETITION FOR REVIEW OF FINAL AGENCY ACTION PER 49 U.S.C. SECTION 46110 AND RULE 16 OF THE FEDERAL RULES OF APPELLATE PROCEDURE

---

## PETITIONERS' OPENING BRIEF

---

STEPHAN C. VOLKER (CSB #63093)
ALEXIS E. KRIEG (CSB #254548)
STEPHANIE L. CLARKE (CSB #257961)
JAMEY M.B. VOLKER (CSB # 273544)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Ave
Berkeley, California 94703
Tel: (510) 496-0600
Fax: (510) 845-1255
svolker@volkerlaw.com,
akrieg@volkerlaw.com,
sclarke@volkerlaw.com,
jvolker@volkerlaw.com
Attorneys for Petitioners
BACKCOUNTRY AGAINST DUMPS, DONNA
TISDALE, and JOE E. TISDALE

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners Backcountry Against Dumps, Donna Tisdale and Joe E. Tisdale submit the following disclosure statement.

Petitioner Backcountry Against Dumps is a non-profit corporation, and does not have any parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad. Petitioners Donna Tisdale and Joe E. Tisdale are individuals suing in their individual capacity.

July 13, 2022

Respectfully submitted,

*/s/ Stephan C. Volker*
STEPHAN C. VOLKER
Attorney for Petitioners
BACKCOUNTRY AGAINST DUMPS, et al.

i

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**. . . . . . . . . . . . . . . . . . . . . . . . i

**TABLE OF CONTENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF APPELLATE COURT JURISDICTION**. . . . . . . . . . . . 2

**ISSUE ON REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**ADDENDUM**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**I.    AMONG THE WORLD'S TALLEST AT 586 FEET, THE 60
       CAMPO WIND TURBINES WOULD EXTEND 10 MILES
       ATOP THE CREST OF THE COAST RANGE, POSING
       IMPACTS ON AVIATION SAFETY INCLUDING AERIAL
       FIREFIGHTING**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   **A.   THE FAA ADMITS THE PROJECT OBSTRUCTS
         NAVIGABLE AIRSPACE**. . . . . . . . . . . . . . . . . . . . . . . . . . 6

   **B.   THE FAA DISMISSES THE PROJECT'S SIGNIFICANT
         ADVERSE IMPACTS ON ARBITRARY GROUNDS**. . . . . . . . 10

**II.   PETITIONERS RAISED SERIOUS CONCERNS ABOUT
       THE PROJECT'S IMPACTS ON AVIATION SAFETY**. . . . . . . . . . 16

**III.  THE FAA GRANTED PETITIONERS' FIRST
       ADMINISTRATIVE PETITION FOR REVIEW IN 2021**. . . . . . . . 22

**IV.   THE FAA ERRONEOUSLY EXCLUDED PETITIONERS
       FROM ITS SECOND PUBLIC REVIEW PROCESS**. . . . . . . . . . . 23

**V.    THE FAA ERRONEOUSLY REJECTED PETITIONERS'
       REQUEST THAT IT EITHER  REOPEN ITS SECOND
       COMMENT PERIOD AND ALLOWTHEIR COMMENTS, OR
       ALLOWTHEIR ADMINISTRATIVE PETITION FOR REVIEW**. . . 24

**SUMMARY OF ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**I.** **THE FAA MUST COMPLY WITH ITS PUBLIC NOTICE RULES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**II.** **THE FAA FAILED TO COMPLY WITH ITS PUBLIC NOTICE AND ADMINISTRATIVE REVIEW RULES** . . . . . . . . . . . 36

**III.** **BECAUSE THE FAA FAILED TO COMPLY WITH ITS PUBLIC NOTICE RULES, PETITIONERS NEVER RECEIVED NOTICE OF THE FAA'S SECOND COMMENT PERIOD ON ITS AERONAUTICAL STUDIES.** . . . . . . . . . . . . . . . 38

**IV.** **BECAUSE PETITIONERS WERE NOT PROVIDED NOTICE OF THE FAA'S SECOND COMMENT PERIOD, PETITIONERS WERE PREVENTED FROM SUBMITTING THEIR COMMENTS AND FILING THEIR ADMINISTRATIVE PETITION FOR REVIEW** . . . . . . . . . . . . . . . . 39

**V.** **BECAUSE PETITIONERS WERE NOT GIVEN AN OPPORTUNITY TO SUBMIT THEIR COMMENTS ON THE PROJECT, THE FAA WAS REQUIRED TO AFFORD PETITIONERS THE RIGHT TO PETITION THE FAA TO REVIEW ITS DETERMINATION THAT THE PROJECT POSED NO HAZARD TO NAVIGATION SAFETY** . . . . . . . . . . . . . 40

**VI.** **THIS COURT SHOULD VACATE THE FAA'S REFUSAL TO ALLOW PETITIONERS TO FILE THEIR ADMINISTRATIVE PETITION REQUESTING THE FAA'S REVIEW OF ITS DETERMINATION THAT THE PROJECT POSED NO HAZARD TO AVIATION SAFETY.** . . . . . . . . . . . . . . . . . . . . . . . . . 43

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**STATEMENT OF RELATED CASE.** . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**FORM 8 CERTIFICATE OF COMPLIANCE** . . . . . . . . . . . . . . . . . . . . . 46

**ADDENDUM.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Hartz v. United States,*
387 F.2d 870, 874 (5th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Husain v. Olympic Airways,*
316 F.3d 829 (9th Cir. 2002),
aff'd, 540 U.S. 644 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Lightenburger v. United States,*
298 F.Supp. 813 (C.D.Cal. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Torres-Lopez v. May,*
111 F.3d 633 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Town of Barnstable, Mass. v. FAA,*
740 F.3d 681 (D.C.Cir. 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Perez v. Mortgage Bankers Association,*
575 U.S. 92 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States ex rel. Accardi v. Shaughnessy,*
347 U.S. 260 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Miller,*
303 F.2d 703 (9th Cir. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Vitarelli v. Seaton*
359 U.S. 535 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## CALIFORNIA CASES

*Sierra Pacific Holdings, Inc. v. County of Ventura*
204 Cal.App.4th 509 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## FEDERAL STATUTES

United States Code, Title 5
§§ 701-706 ("APA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 706(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 35, 36
§ 706(2)(A)-(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

United States Code, Title 49
§ 44718. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
§ 44718(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
§ 46110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
§ 46110(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

iv

# FEDERAL REGULATIONS

Code of Federal Regulations, Title 14
 Part 77. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  § 77.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  § 77.17(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  § 77.17(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  § 77.17(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  § 77.29(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  § 77.29(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
  § 77.31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  § 77.31(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 42
  § 77.35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
  § 77.37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  § 77.37(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  § 77.39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 34, 36
  § 77.41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 39
 Part 91. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# RULES

Federal Aviation Administration Orders
 Procedures for Handling Airspace Matters, FAA Order JO 7400.2
 ("Handbook") (February 28, 2019). . . . . . . . . . . . . . . . . . . . . *passim*
  Paragraph 1-1-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
  Paragraph 6-3-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  Paragraph 6-3-8. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12, 22
  Paragraph 6-3-8(b)(8). . . . . . . . . . . . . . . . . . . . . . . . 12, 22
  Paragraph 6-3-8(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  Paragraph 6-3-17. . . . . . . . . . . . . . . . . . . . . . . . . 22, 26, 42
  Paragraph 6-3-17(c). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  Paragraph 6–3–17(d). . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Federal Rules of Appellate Procedure
 Rule 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Ninth Circuit Rules
 Rule 28-2.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

# I. INTRODUCTION

This case poses a simple issue: must the Respondents Federal Aviation Administration ("FAA") and U.S. Department of Transportation (collectively, "Respondents" or "FAA") abide by their public notice and comment regulations requiring them to allow Petitioners Backcountry Against Dumps, Donna Tisdale and Joe E. Tisdale ("Petitioners" or "Backcountry") to file their administrative Petition for Review challenging the FAA's determination that a 586-foot high, 10-mile wide wind turbine project atop the Coast Range poses no hazards to aviation safety?

Petitioners respectfully petition this Court, pursuant to 49 U.S.C. section 46110 and based on Respondents' Agency Record ("AR") certified and augmented under Rule 16 of the Federal Rules of Appellate Procedure, for review of Respondents' October 15, 2021"Notice of Invalid Petition Received" denying Petitioners' September 30, 2021Petition for Review of the FAA's Determination of No Hazard to Air Navigation for 72 wind turbines associated with the Campo Wind Project with Boulder Brush Facilities ("Campo Wind Project" or "Project")). The Campo Wind Project would construct some of the tallest wind turbines ever built on land in the United States, including 60 turbines 586 feet high – roughly twice the height of the Statue of Liberty. They would be built in 13 groups atop the crest of the Coast Range and within the principal aviation corridor between San Diego, California and Yuma, Arizona, and would impair radar function, impede aerial firefighting and other emergency response, and force air traffic to fly at higher altitudes more prone to icing hazards to clear these enormous obstructions.

1

## STATEMENT OF APPELLATE COURT JURISDICTION

This Court has jurisdiction of this Petition for Review of final agency action by Respondents pursuant to the judicial review provisions of 49 U.S.C. section 46110. Section 46110(a) provides in pertinent part that "a person disclosing a substantial interest in an order issued by the . . . Administrator of the Federal Aviation Administration . . . may apply for review of the order by filing a petition for review in the . . . court of appeals of the United States for the circuit in which the person resides or has its principal place of business."

This Court's rules provide for review of Respondents' challenged Project approval based on its Agency Record as augmented in accordance with Rule 16 of the Federal Rules of Appellate Procedure. Rule 16 prescribes the contents of the judicial record on review of a final agency order.

## ISSUE ON REVIEW

This Petition for Review raises a single, simple issue: Did the FAA violate its regulations for hearing administrative petitions for review by refusing to consider, and instead declaring "invalid," Petitioners' timely and procedurally compliant administrative Petition for Review submitted on September 20, 2021, pursuant to 49 U.S.C. section 44718 and 14 C.F.R. sections 77.37 and 77.39, seeking review of the FAA's August 31, 2021 Determinations of No Hazard to Air Navigation ("DNHs" or "Letter Determinations") for the Campo Wind Project? The FAA rejected Petitioners' administrative Petition for Review on the sole grounds that Petitioners did not submit a second (in addition to their first), separate set of comments during the FAA's second comment period. However, Petitioners never received notice of that second comment period, and therefore were entitled to file their Petition for Review under the FAA's own regulations.

**ADDENDUM**

In accordance with Ninth Circuit Rule 28-2.7, Petitioners have included an Addendum containing pertinent statutes and regulations.

**STATEMENT OF THE CASE**

This is a public interest case seeking to protect the public's aviation safety and to compel the FAA to abide by its public notice rules. It arises from the FAA's refusal to consider, on the grounds it was "invalid," Petitioners' timely and procedurally compliant 96-page administrative Petition for Review submitted on September 20, 2021, objecting to and seeking review of the FAA's August 31, 2021 Determinations of No Hazard to Air Navigation for 72 wind turbines associated with the Campo Wind Project ("DNHs" or "Determination Letters"). Their Petition for Review addresses the virtually identical determination of no hazard letters issued by the FAA for each of the Project's turbines, identified as ASN 2019-WTW-4517-OE through ASN 2019-WTW-4580-OE, inclusive, and ASN 2019-WTW-4585-OE through ASN 2019-WTW-4592-OE, inclusive,[1]

---

[1] The 72 DNHs relate to the following wind turbines proposed for the Campo Wind Project: ASN 2019-WTW-4517-OE, ASN 2019-WTW-4518-OE, ASN 2019-WTW-4519-OE, ASN 2019-WTW-4520-OE, ASN 2019-WTW-4521-OE, ASN 2019-WTW-4522-OE, ASN 2019-WTW-4523-OE, ASN 2019-WTW-4524-OE, ASN 2019-WTW-4525-OE, ASN 2019-WTW-4526-OE, ASN 2019-WTW-4527-OE, ASN 2019-WTW-4528-OE, ASN 2019-WTW-4529-OE, ASN 2019-WTW-4530-OE, ASN 2019-WTW-4531-OE, ASN 2019-WTW-4532-OE, ASN 2019-WTW-4533-OE, ASN 2019-WTW-4534-OE, ASN 2019-WTW-4535-OE, ASN 2019-WTW-4536-OE, ASN 2019-WTW-4537-OE, ASN 2019-WTW-4538-OE, ASN 2019-WTW-4539-OE, ASN 2019-WTW-4540-OE, ASN 2019-WTW-4541-OE, ASN 2019-WTW-4542-OE, ASN 2019-WTW-4543-OE, ASN 2019-WTW-4544-OE, ASN 2019-WTW-4545-OE, ASN 2019-WTW-4546-OE, ASN 2019-WTW-4547-OE, ASN 2019-WTW-4548-OE, ASN 2019-WTW-4549-OE, ASN 2019-WTW-4550-OE, ASN 2019-WTW-4551-OE, ASN 2019-WTW-4552-OE,

pursuant to 49 U.S.C. section 44718 and 14 C.F.R. sections 77.37 and 77.39, objecting to and seeking review of the FAA's August 31, 2021 DNH's for the Campo Wind Project. Petitioners' Opening Excerpts of Agency Record, filed concurrently ("ER"), Volume 2, pages 4-99 ("2-ER-4-99") (Petition for Review); 2-ER-100 (Petitioners' transmittal email); 6-ER-1118 (Project site map).

As detailed in the following Statement of Facts, this judicial proceeding arises from the second time Petitioners sought administrative review of the FAA's approval of this mammoth Project. The first time, in response to Petitioners' initial administrative Petition for Review filed August 17, 2020, the FAA's internal administrative review process worked. Following receipt on January 30, 2020 of Petitioners' 666-page comments on the FAA's consideration of the Project for a determination that its 72 wind turbines posed no hazard to aviation safety (4-ER-444-643; 5-ER-645-782, 785-927; 6-ER-929-1111), the FAA circulated public notice of its approval of the Project on July 16, 2020, prompting Petitioners' timely filing of their Petition for Review on August 17, 2020 (3-ER-179-412). After the

---

ASN 2019-WTW-4553-OE, ASN 2019-WTW-4554-OE,
ASN 2019-WTW-4555-OE, ASN 2019-WTW-4556-OE, ASN
2019-WTW-4557-OE, ASN 2019-WTW-4558-OE, ASN 2019-WTW-4559-OE,
ASN 2019-WTW-4560-OE, ASN 2019-WTW-4561-OE, ASN
2019-WTW-4562-OE, ASN 2019-WTW-4563-OE, ASN 2019-WTW-4564-OE,
ASN 2019-WTW-4565-OE, ASN 2019-WTW-4566-OE,
ASN 2019-WTW-4567-OE, ASN 2019-WTW-4568-OE, ASN
2019-WTW-4569-OE, ASN 2019-WTW-4570-OE, ASN 2019-WTW-4571-OE,
ASN 2019-WTW-4572-OE, ASN 2019-WTW-4573-OE, ASN
2019-WTW-4574-OE, ASN 2019-WTW-4575-OE, ASN 2019-WTW-4576-OE,
ASN 2019-WTW-4577-OE, ASN 2019-WTW-4578-OE,
ASN 2019-WTW-4579-OE, ASN 2019-WTW-4580-OE, ASN
2019-WTW-4585-OE, ASN 2019-WTW-4586-OE, ASN 2019-WTW-4587-OE,
ASN 2019-WTW-4588-OE, ASN 2019-WTW-4589-OE, ASN
2019-WTW-4590-OE, ASN 2019-WTW-4591-OE, and
ASN 2019-WTW-4592-OE

FAA found that petition valid (2-ER-176-177), leading to the FAA's review of the objections it raised, the FAA determined the petition had merit (2-ER-173-175), vacated its approval of the Project (*id*.), and ordered further examination of the Project's potential for harm to aviation safety to correct the incomplete reviews that had led to the initial, ill-considered approval (*id*.).

The second time, however, the FAA neglected to afford Petitioners notice of the FAA's public comment period even though they are well known to the FAA as the parties who had successfully petitioned for administrative review of the FAA's initial Determination Letters and indeed, had caused those DNHs to be rescinded in response to that petition. As a consequence, Petitioners were unaware of the second comment period until after it had closed. *See*, Petitioners' Motion to Augment Agency Record filed July 13, 2022 ("Motion to Augment"), Exhibit 1. Notwithstanding its failure to afford Petitioners notice of this second comment period, the FAA proceeded to reapprove the Project on August 31, 2021. *E.g.*, 2-ER-101-114. Although Petitioners had previously submitted extensive comments on the Project during the initial comment period in 2020, and timely filed an administrative Petition for Review of the FAA's August 31, 2021 approval of the Project on September 30, 2021 (2-ER-4-99), on October 15, 2021 the FAA declined to accept, let alone consider, their second petition, deeming it "invalid" because Petitioners had failed to submit comments during the second comment period (1-ER-2).

Petitioners responded on October 25, 2021, explaining that they had not received notice of the second comment period, and had previously submitted comments during the original comment period in 2020. Motion to Augment, Exhibit 1. Because the FAA had failed to afford Petitioners notice of the second comment period, and the FAA had received Petitioners' original comments on the

same Project in 2020, Petitioners requested reconsideration of the FAA's rejection of their Petition for Review as invalid. *Id*. However, the FAA declined to do so. *Id*. Exhibit 2.

Having thus exhausted their administrative remedies, on December 14, 2021 Petitioners filed this Petition for Review. Petitioners ask this Court to set aside the FAA's determination that Petitioners' administrative Petition for Review was invalid, and direct the FAA to consider Petitioners' petition, so that Petitioners' concerns about this Project may be addressed.

## STATEMENT OF FACTS

### I. AMONG THE WORLD'S TALLEST AT 586 FEET, THE 60 CAMPO WIND TURBINES WOULD EXTEND 10 MILES ATOP THE CREST OF THE COAST RANGE, POSING IMPACTS ON AVIATION SAFETY INCLUDING AERIAL FIREFIGHTING

#### A. THE FAA ADMITS THE PROJECT OBSTRUCTS NAVIGABLE AIRSPACE

It is undisputed that the Project site lies directly beneath, and *as approved*, the Project will directly obstruct, navigable airspace that is actively utilized for military, commercial and private flights. The FAA approved the Project by issuing 72 virtually identical 14-page Determination Letters, one for each of the 72 turbine towers that are proposed to be constructed and which have been assigned individual Aeronautical Study Numbers ("ASNs"). *E.g.*, 2-ER-101-114, 115-128, 129-142. Each of the 60 turbines that would be built would tower 586 feet above ground level ("AGL"), reaching elevations from 3,992 (ASN 2019-WTW-4526) to 4,993 feet (ASN 2019-WTW-4580) above mean sea level ("AMSL"). *E.g.*, 2-ER-143-156, 157-170. Each of the DNHs admits the Project would obstruct air navigation by exceeding the FAA's adopted obstruction standards in the following ways:

1.  "All [of the] proposed structures would exceed [the 14 C.F.R. section 77.17(a)(1) Obstruction Standards] by 87 feet."

2.  "The following ASN's would [exceed the 14 C.F.R. section 77.17(a)(3) height limit within a terminal obstruction clearance area by increasing] the Southern California TRACON (SCT) [for] San Diego, CA SCT_MVA [minimum vectoring altitude] . . .  in Sector SCT124 from 5,200 feet AMSL to 5,300 feet AMSL[:]

> 2019-WTW-4520-OE
> 2019-WTW-4521-OE
> 2019-WTW-4522-OE

The following ASN would increase the SCT_MVA . . . in Sector ZZ from 5,800 AMSL to 5,900 feet AMSL[:]

> 2019-WTW-4578-OE."

3.  "[14 C.F.R. s]ection 77.29(a)(1):  the impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules.  At 586 feet, *the following structures would extend into airspace normally utilized for VFR [visual flight rules] en route flight by 87 feet.  The structures would be located within 2 statute miles of a VFR Route* (Interstate 8, State Route 94, and a railroad track) as defined by FAA Order 7400.2, paragraph 6-3-8 *and would have an adverse effect upon VFR air navigation[:]*

2019-WTW-4517-OE . . . 2019-WTW-4590-OE [listing 70 turbines in total]

4.  "[14 C.F.R.] [s]ection 77.29(a)(6):  potential effect on ATC [air traffic control] radar, direction finders, ATC tower line-of-sight visibility, and physical or electromagnetic effects on air navigation, communication facilities, and other surveillance systems.  *The following proposed wind turbines would be within the radar line of sight (RLOS) of the San Clemente, CA (NDSD) ARSR-4 radar facility.*

*They may affect the quality and/or availability of the NSD ARSR-4 radar facility. The proposed wind turbines may cause unwanted primary returns (clutter) and primary-only target drops in the immediate area of the turbines. Additionally, tracked primary only returns could diverge from the aircraft path following the turbines when aircraft are over or near the wind farm[:]*

>       2019-WTW-4520-OE
>       2019-WTW-4524-OE
>       2019-WTW-4550-OE
>       2019-WTW-4551-OE"

*E.g.*, 2-ER-9-11.

The site is located in the Border Zone (*E.g.* 2-ER-114, 128) and is situated between and in proximity to numerous military bases and air stations in California vital to the nation's defense, including the Naval Air Station in North Island, San Diego, the Marine Corps Air Station in Miramar, San Diego, the Naval Air Facility in El Centro, and the Naval Special Forces Training Facility in nearby Campo. 4-ER-439-440. This same airspace is also in use by the Marine Corps Air Station in Yuma, Arizona.[1] The Project site is located within an active route between these military bases and air stations (2-ER-5-7), and is regularly frequented by their low flying aircraft, including military rotary aircraft (helicopters) that are particularly sensitive to icing conditions encountered at the higher altitudes the Project might force aircraft to use (2-ER-6).

Non-military aircraft also utilize the air lanes that crisscross the Coast Range in the vicinity of the Project, prompting the following concerns by at least one FAA analyst familiar with the Project and its potential impacts both on aircraft flying under visual flight rules and those operating under instrument flight rules:

---

[1] Military Base List, available at: https://www.military.com/base-guide, last accessed January 8, 2020.

"Southern California TRACON (SCT) objects to the proposed wind farm as requested at Campo, CA – 19WTW-4517 thru 19-WTW-4592[:]

[1.]  New MVA [minimum vector altitude] in Sector SCT118 from 6,000 feet AMSL to 6,100 feet AMSL.
Significant impact. *The loss of a cardinal altitude plus raising the altitude over a large area such as SCT118 would have a significant negative impact. This area is used extensively for vectoring arrivals* to KSEE, KMYF, KSDM, KNZY, and KSAN.

[2.]  MEA - > Increases the MEA on V317 from JONDA to BROWS from 7,000 feet AMSL to 7,200 feet AMSL. The NEH is 5,000feet AMSL.
Significant impact. *This airway is commonly used, but more so during the winter months as a safe route for aircraft who cannot climb to higher altitudes due to icing conditions, this airway has the lowest MEA [minimum en route altitude] for crossing the mountains to the east. The aircraft that use this are General Aviation fixed wing aircraft from all the San Diego area airports, and military rotary aircraft (who are very ice sensitive) from MCAS Miramar and NAS North Island. The loss of the 7,000 feet MEA would be significant as it forces all along the route to 8,000 feet MSL and higher.*

[3.]  MIA - > Increases the MIA for Los Angeles ARTCC (ZLA); ZLA_TAV_2018_V1 in LAN15 from 7,000 feet AMSL to 7,100 feet AMSL.
Significant impact. *This would eliminate the use of a cardinal altitude for vectoring between Southern California TRACON and Los Angeles Center* (See previous rationale) Additionally it appears that this MIA accommodates vectoring in and around the El Centro, CA area, which I would presume  would have a negative impact on ZLA's operations in that area.
*If this project is approved it will have a significant negative effect on operations in the target area . "*

4-ER-438-440.

The FAA's Agency Record contains cryptic passages revealing that the Project proponent engaged in undisclosed communications with the FAA, apparently assuring the FAA that concerns about the Project had been or would be addressed, but these passages omit the proponent's communications, and the FAA's responses to them.  *E.g.*, 4-ER-430-436 (comment from FAA official Bill Keifer to FAA analyst Ed Snow dated March 24, 2020 that "[t]he sponsor for this wind project agreed to terminate the turbines that would create the loss of cardinal

9

altitude"). The Agency Record does not disclose the specific mitigation measures proposed by the Project proponent, nor address their efficacy. Nor does it demonstrate that these possible mitigation measures were in fact imposed as enforceable conditions of approval by the FAA or some other agency with jurisdiction over the Project.

### B. THE FAA DISMISSES THE PROJECT'S SIGNIFICANT ADVERSE IMPACTS ON ARBITRARY GROUNDS.

The FAA is required by statute and regulation to protect the public, including those whose aircraft fly by "Visual Flight Rules," or "VFR," and those who fly by Instrument Flight Rules, or "IFR." 49 U.S.C. § 44718(b); 14 C.F.R. Part 77; *Town of Barnstable, Mass. v. FAA*, 740 F.3d 681 (D.C.Cir. 2014). The Project is sited between several airports used by general aviation pilots flying under VFR, including Montgomery Field, Gillespie Field, Lindbergh Field and Jacumba Airport in San Diego County, Imperial County Airport, and Yuma Airport in Arizona. 2-ER-172. The FAA's Determination Letters acknowledge that the proposed "structures would be located within the altitudes commonly used for en route VFR flight." *E.g.*, 2-ER-111. Indeed, flights from Montgomery or Lindbergh fields to Yuma would likely pass directly over the Project. 2-ER-172. Yet the Determination Letters state that "the proposed wind farm would not affect a significant volume of aircraft." 2-ER-111.

It is apparent the Determination Letters' conclusions conflict with the evidence. *E.g.*, 2-ER-111. The documentation in the FAA's files shows, contrary to the Determination Letters, that the Project is located directly within a regularly, and continuously, used VFR en-route flyway. 2-ER-172. The FAA's Handbook states "[a] structure would have an adverse effect upon VFR air navigation if its height is greater than 499 feet above the surface at its site, and within 2 statute

10

miles of any regularly used VFR route." Procedures for Handling Airspace Matters, FAA Order JO 7400.2M (February 28, 2019), Paragraph 6-3-8(c)(1).

The Project meets these criteria. As the Determination Letters admit, the VFR route over the Project may be used daily. *E.g.*, 2-ER-111, 125, 139. The wind turbines exceed 499 feet, and the Project site is located within a well known and frequently used VFR route. *E.g.*, 2-ER-101, 106, 111, 115, 1120, 128, 129, 134, 142. FAA policy dictates that any structure that "exceeds the obstruction standards" as these do, "has an adverse effect if it would: . . . Require a VFR operation to change its regular flight course or altitude." FAA Order JO 7400.2M, Paragraph 6-3-3(b)). Here, the FAA's own reviews confirm that the turbines will require altitude changes during VFR operations. *E.g.*, 2-ER-111, 128, 142. Therefore, this Project has an adverse effect.

The FAA cites its internal policy's definition of "significant volume" to justify dismissal of these significant adverse effects. Each Determination Letter issued by the FAA concludes that, although

> "the structures would be located within the altitudes commonly used for en route VFR flight, . . . *an average of less than one VFR aircraft per day may be affected by the proposed wind farm. In accordance with FAA Order 7400.2, the proposed wind farm would not affect a significant volume of aircraft* and therefore, it is determined they will not have a substantial adverse effect on en route VFR flight operations."

2-ER-111 (emphasis added), citing FAA Order [JO]7400.2L, Paragraph 6-3-5.[2] JO 7400.2M, Paragraph 6-3-4 defines "regular and continuing" operations as "one or more operations" a day. *But* this policy *also* notes that if the impacted procedure is

---

[2] The Determination Letters rely upon JO 7400.2L, which was withdrawn in February 2019. JO 7400.2N, the applicable current verison, contains the same policies as they relate to this issue.

the primary procedure, it may need to be used on average only once per *week* to cause a significant impact on aeronautical activities:

> "However, an affected instrument procedure or minimum altitude may need to be used only an average of once a week to be considered significant if the procedure is one which serves as the primary procedure under certain conditions."

JO 7400.2N, Paragraph 6-3-4.  Here, as discussed above, minimum altitudes serve as a primary procedure for numerous aircraft, particularly during the winter when icing is a greater concern, and therefore, flight frequency need not be once a day to be considered significant.  2-ER-111; 4-ER-438-440; FAA Order JO 7400.2M, Paragraphs 6-3-3(b) and 6-3-4. Here, the impact is significant,  hazardous, and potentially severe.

The FAA's Determination Letters do not address all the hazards identified by its Divisions.  For example, for all but three of the towers, on March 11, 2021 FAA Flight Standards analyst Roland McKee issued a "Safety advisory" that warned of the

> "potential hazard created by the adverse effect on VFR navigation:  The Structures of this project lie within 2SM [statute miles] of Interstate 8, State Route 94, and railroad tracks which is a navigable surface feature that meets the definition of a VFR route per FAA Order JO 7400.2M, chap. 6, sec. 3, par. 6-3-8(b)(8) & associated Fig. 6-3-8.  *At its proposed location and height (AGL), the structure will have an adverse effect upon VFR pilotage navigation, especially during periods of ceiling and visibility conditions at or near the minimum allowed for VFR flight. If* the OEG [Obstruction Evaluation Group] in consultation with Flight Standards determines that *there is a significant volume of aircraft using the VFR Route, then the proposed wind turbines* within 2 SM of the affected VFR Route *will cause a substantial adverse effect. The proposed wind turbines would then need to be moved to an alternate location  more than 2 SM from any VFR route, or lowered to a maximum height of 499 feet AGL or less at its currently proposed location."*

*E.g.* 6-ER-1112-1113, 1115-1117 (emphasis added) (same statement made for all towers except 4571, 4591, and 4592). The *only* reason the FAA ultimately allowed this Project was that the number of flights currently impacted averaged less than 30

per month and therefore the admitted "adverse effect" was not "substantial," an arbitrary criterion that is subject to exceptions applicable here, as discussed above. JO 7400.2N, Paragraph 6-3-4**.**

These concerns are heightened because (1), the number of flights using local airports varies seasonally, and thus exceeds the 30 flights-per-month criterion in some months, and (2), the local Jacumba Airport, which is less than 10 nautical miles from the Project location, is primarily used for low-altitude flying for recreational purposes, including sailplanes and gliders, whose use is not subject to the minimum altitudes and for which the Project poses admitted "adverse effects."[3] 3-ER-183.

The Determination Letters ignore this primary use in evaluating the Project's significant impacts. And the FAA's reasoning for ignoring these impacts – that these operations "are not regular and continuous" – ignores the forest for the trees. This reasoning is contrary to the purposes of FAA regulations and policies.

These gigantic structures exceed the FAA height limitation of 499 feet by *87* feet (eight stories). 2-ER-106; 6-ER-1118. And, because they would be atop the crest of the Coast Range, they would also increase the minimum safe east-west flight path over those mountains. 4-ER-449. This would force aircraft to fly substantially higher, in some cases by a cardinal, or 1000-foot, increase in elevation. *E.g.* 2-ER-106. This would, according to FAA analysis, cause a "significant negative impact" that would expose these aircraft to dangerous wing and rotor blade icing. 4-ER-438.

---

[3] *See, e.g.*, FAA Notice to Airmen "Frq Gld Act Drg Wkends, Pwrd Acft be Alert for Gld Tfc Launching Frm Field and Operg on and in Vcnty of Ap, Sfc to 18000 Ft MSL.," *see also* Aircraft Owners and Pilots Association webpage for Jacumba Airport: available at https://www.aopa.org/destinations/airports/L78/details; New Desert Times, Towns of Yesteryear, available at: http://newdeserttimes.com/the-towns-of-yesteryear/)

For this and other reasons, the FAA's Southern California TRACON, or Terminal Radar Approach Control Facilities, initially "object[ed] to the proposed [Campo] wind farm."  4-ER-437-445.  While the FAA apparently concluded that removal of some towers would mitigate this hazard, the FAA's Determination Letters do not address this hazard nor how it would be mitigated –  along with other hazards discussed below – and thus fail to show the public that this Project poses no hazards to aircraft safety or operations.

These impacts pose greater hazards in the winter months.  As FAA correspondence admits, "[t]his airway is commonly used, but more so during the winter months as a safe route for aircraft who cannot climb to higher altitudes due to icing conditions, this airway has the lowest MEA [minimum en route altitude] for crossing the mountains to the east."  4-ER-439.  Removing the ability to utilize this route will force aircraft to fly at higher altitudes and due to icing hazards in winter months, unsafe conditions.  *Id*.  As FAA staff has acknowledged, "[i]f this project is approved it will have a significant negative effect on operations in the target area."  4-ER-440.  These impacts must be addressed and again, the risks from these massive structures should be given the greatest possible consideration due to the severity – loss of life – of the potential impacts.

The Project's aviation hazards include impairment of aerial firefighting.  The United States Department of the Interior's Bureau of Indian Affairs ("BIA") premised its approval of the Project on the assumption it "would comply with any applicable Federal Aviation Administration (FAA) requirements to ensure that FAA, military, and *emergency responders* navigate the area safely."  2-ER-13 (quoting from the BIA's Final Environmental Impact Statement on the Project ("FEIS") at RTC-206 (emphasis added)).  Notably, the BIA did not consider how it would impair aerial firefighting and other emergency response because it assumed –

14

incorrectly – that the FAA would perform that essential review and require the Project's compliance with "any applicable" FAA requirements. *Id*. But as noted above, the FAA refused to examine the impact of the Project on aerial firefighting on the grounds "[e]mergency flight operations are not considered when determining the extent of adverse aeronautical effect because they are not considered regular and continuing and it is not possible to predict when or where an emergency operation would be conducted." 2-ER-110.

The FAA ignored other known hazards to aviation safety caused by wind turbines. For example, at dawn and dusk the Project's spinning wind turbines produce disorienting, disco-like "shadow flicker" when viewed from locations that look through the 460-foot wide arc of the 230-foot-long blades toward the rising or setting sun. 2-ER-24-26. The flickering effect moves across the terrain (much like a shadow moves with the sun) and lasts for up to 30 minutes at any particular location, depending on the time of year (and thus the angle and duration of the sun's passage behind the turbine blades), as the sun passes through the plane of the spinning blades. *Id*.

Here, that disorienting effect would be repeated scores of times each morning and each evening up and down the spine of the Coast Range as the sun passes through the 460-foot arcs of some 60 different wind turbines stretching 10 miles along the mountains' crest. *Id*; 6-ER-1118. The resulting impact on pilots approaching the crest from the west (and thus looking directly into the rising sun) in the morning or from the east (and thus looking directly into the setting sun) in the evening would pose a significant hazard to aviation safety. *Id*. The FAA's Determination Letters never address this hazard, even though Petitioners twice brought this problem to the FAA's attention by raising it in their administrative Petitions for Review. 2-ER-24-26; 3-ER-202-203. Instead, the FAA just ignored

15

the problem. But ignoring the problem does not make it go away. Instead, it just makes the problem worse.

## II.   PETITIONERS RAISED SERIOUS CONCERNS ABOUT THE PROJECT'S IMPACTS ON AVIATION SAFETY

The Agency Record reveals that many of Petitioners' concerns were brushed aside as irrelevant or beyond the scope of the FAA's approval authority, leaving unanswered whether the legitimate safety issues raised by the public would ever be addressed by any reviewing agency, let alone in a manner that would allow for informed public review and comment. For example, the public raised the following concerns that the FAA dismissed from consideration:

1. The obstruction lighting is insufficient to mitigate the collision hazard.

The public commented:

"The installation of obstruction lighting on the wind turbines alone will not mitigate the unacceptable hazard to aviation safety. Standard FAA lighting are [sic] ineffective for military and air ambulance pilots using night vision goggles (NVG). The turbine blade tip would be 230 feet above the obstruction light located on top of the nacelle creating a hazard for low-flying aircraft."

*E.g.*, 2-ER-109.

The FAA dismissed this concern on the principal grounds that

"The current guidance recommends placing the obstruction lighting as high as possible on the turbine's nacelle so they are visible to pilots approaching the turbine from any direction. Studies have shown that red obstruction lights provide the most conspicuity to pilots."

*Id*. The FAA's response overlooks the commenter's primary point, which is that the nacelle – and therefore its red light  – are 230 feet (about 20 stories) *below* the tip of the rotor blade, and thus ineffective to warn the pilot of the presence of the blade, which is invisible at night, hundreds of feet above. At 12 revolutions per minute a 230-foot blade tip travels at nearly 200 miles per hour.[4]

---

[4] Multiplying the blade sweep's 460 foot diameter by *pi* yields a 1,445-foot circumference; multiplying by twelve yields 17,340 feet traveled in one minute;

The FAA's response asserts that if a red light is placed "as high as possible" on the nacelle it would be "visible to pilots approaching the turbine from any direction." *Id*. Not so. The nacelle is the tip of the horizontal rotor around which the vertically-mounted turbine blades spin and thus is 230 feet , or twenty stories, *below* the tip of the rotor blades. A single red light hundreds of feet below the obstruction does not alert the pilot to the obstruction's location. The presence of fog, clouds, rain or snow would just make this hidden hazard that much worse. And, a red light on the nacelle would not be visible to a pilot approaching the turbine from the opposite side of the turbine tower.

2. The increase in altitude over mountainous terrain will create a hazard to aviation.

The public commented:

"Between 2003 and 2016, ten individuals were killed in the United States as a result of aircraft collisions with wind turbines and their towers. . . . . Aircraft are often observed in the area of the proposed wind farm flying at 'very low altitudes'. The increase in altitude over mountainous terrain would create a hazard to aviation." *Id*.

The FAA discounted this concern on the grounds that

"[a]ircraft operating at 'very low altitudes' would be below the minimum safe altitudes specified in 14 CFR Part 91. Flight operations such as agricultural, land surveys, law enforcement, etc. are not regular and continuous flight operations and therefore *are not considered in determining the extent of adverse effect* under 14 CFR Part 77 aeronautical studies."

2-ER-109 (emphasis added). The FAA's decision to "not consider" the frequent low-altitude flights in the Project's vicinity is a blueprint for avoidable aircraft collisions. Petitioners should be heard on this public safety issue.

3. The Project would increase the minimum en route altitude over the Coast Range by 200 feet, from 7,000 feet to 7,200 feet.

The public commented:

---

multiplying by 60 yields 1,040,400 feet traveled in one hour; dividing 1,040,400 by 5,280 feet per mile yields 197 mph.

"At a height of 586 feet tall, the turbines exceed 14 CFR Part 77 by 87 feet; a height greater than 499 feet AGL. The proposal would increase the minimum en route altitude (MEA) and the minimum obstruction clearance altitude (MOCA) from 7,000 feet to 7,200 feet."

2-ER-109.

The FAA dismissed this concern as well, stating:

"Although the proposed structures exceed 14 CFR Part 77 obstruction standards, it does not necessarily constitute a hazard to aviation. . . . After further study of the proposal by the responsible Air Traffic facilities and negotiation with the project sponsor, the sponsor agreed to terminate the affected ASNs, therefore eliminating the MOCA and MEA increases. *The proposal would cause the MVA [minimum vector altitude] increase for SCT as identified above. MVAs are solely used by ATC, not published for public use and therefore not circulated for public comment.* A review by the controlling facility determined that *increasing the altitude in the sector* would ensure the required obstacle clearance is maintained and therefore *would not have a substantial adverse effect on Air Traffic operations."*

2-ER-109 (emphasis added).

But the FAA's response fails to identify the specific ASNs "the sponsor agreed to terminate," let alone confirm how this restriction would be enforced, leaving the public in the dark. Moreover, in the same breath the FAA admits the minimum vector altitude *would* be increased to accommodate the Project, notwithstanding the FAA's air traffic controllers' warning that increasing the minimum altitudes in which aircraft operate impairs aircraft safety by forcing aircraft to *higher altitudes and thus colder air where icing is more likely. E.g.*, 2-ER-6; 4-ER-438-440.

The FAA's refusal to allow Petitioners to file an administrative petition to raise this important safety issue harms the public. The public will bear the risk that 60 wind towers placed atop the Coast Range in active aviation lanes will threaten their safety. They are entitled to be heard.

5. The Project would place four wind turbines within the Radar Line of Sight ("RLOS") and otherwise degrade radar safety systems:

The public commented:

18

> "The wind turbines will have an adverse impact on Radar systems by causing *false targets, false returns, clutter and/or dropped targets*. The degraded Radar coverage poses a severe aviation hazard due to the weather patterns over mountainous terrain."

2-ER-110 (emphasis added).

The FAA admitted these impacts, but nonetheless discounted them:

> "The aeronautical study identified 4 turbines as being within the Radar Line of Sight (RLOS) of the San Clemente, CA (NSD) ARSR-4 radar facility. *Impacts to radar facilities are not circularized to the public for comments* as they only require review by the military services and responsible Air Traffic Control (ATC) facility. Further review determined this would not cause an unacceptable adverse impact on ATC or military operations in the area of the turbines at this time.

2-ER-110. The FAA did not deny the Project would "cause[] false targets, false returns, clutter and/or dropped targets," impairing aviation safety, because its Technical Operations Division had found, in a report not publicly disclosed, that four turbines (ASN 4520, 4524, 4550 and 4551) would degrade radar function:

> "The proposal has a physical and/or electromagnetic radiation effect upon the NSD (ARSR-4) radar facility(s). The proposal will affect the quality and/or availability of NSD (ARSR-4) radar signal(s). *Further study is necessary to fully determine the extent of the effect*. The effect can be eliminated by lowering the proposal [i.e., lowering the turbines] to NEH AMSL (ft) of 4052 AMSL (ft). The effects, their locations, and the facilities affected are: - Radar Facility: NSD (ARSR-4) Effects: 1) *Unwanted primary-only returns (clutter) and primary-only target drops, all in the immediate area of the turbines.* 2) *Tracked primary-only targets could diverge from the aircraft path and follow wind turbines, when the aircraft is over or near the turbines.* Note: that the turbines with RLOS covers a small localized area (only 4 turbines). This should be considered when determining operational impact. *Facilities affected: The NSD ARSR-4 radar facility feeds the ERAM automation system at San Diego, CA (SCT) Air Route Traffic Control Center (ARTCC) facility, and Los Angeles, CA (ZLA) Air Route Traffic Control Center (ARTCC) facility.*"

6-ER-1113 (emphasis added) (see same for 6-ER-1115-1117). The FAA never told the public why these serious degradations to its radar safety are not an "unacceptable adverse impact" on air traffic control. Petitioners should be heard regarding these threats to their safety, rather than relegated to mute bystanders.

6. The turbulence generated by spinning turbines creates a hazard for aircraft.

The public commented:

"The turbulence generated by the wind turbines create[s] a hazard for aircraft."

2-ER-110.

The FAA dismissed this concern, stating:

"*The effects of wind turbine vortex, vortices, turbulence or severe weather phenomenon is beyond the scope of 14 CFR Part 77 and therefore was not considered* during the aeronautical study."

2-ER-110 (emphasis added). Since these effects of wind turbine operation impact aviation safety, there is no reason the FAA should ignore them. If the FAA's decision to ignore these effects is due to its regulatory omission, then that omission should be discussed rather than preemptively deemed off-limits to the public whose safety is jeopardized by the FAA's refusal to examine these effects.

7. High voltage wind turbines cause wildfires.

The public commented:

"High voltage *wind turbines have a history of erupting into flames* when the motors burn out, which increases the risk of wildfires. The wind turbines will pose a hazard to emergency services such as medical flights and firefighting. The turbines will impede low-level flight required for air tank[er] drops and smokejumpers which will *interfere with firefighting safety and effectiveness.*"

2-ER-110 (emphasis added).

The FAA refused to consider these impacts, stating:

"*Emergency flight operations are not considered* when determining the extent of adverse aeronautical effect *because they are not considered regular and continuing and it is not possible to predict when or where an emergency operation would be conducted*. . . . Wildfires and the effects of their associated smoke plumes are beyond the scope of an aeronautical study conducted under 14 CFR Part 77."

*Id*. (emphasis added). The FAA's categorical refusal to consider the risk to aviation safety caused by wind turbine fires is akin to not building fire stations because fires

are not "regular and continuing" and it is "not possible to predict when or where an emergency operation would be conducted." *Id*. The point of aviation safety reviews is to identify hazards and ways to mitigate or avoid them, not disregard hazards just because their occurrences and locations cannot be precisely predicted. Particularly where, as here, it is known that wind turbines cause wildfires – and pose risks to aerial firefighting because they impede low-flying deliveries of aerial retardant – it is incumbent on the FAA to examine those risks, not ignore them.

Petitioners did their level best to persuade the FAA to do its job. They submitted extensive comments in good faith to alert the FAA to the aviation safety issues posed by the Project. 4-ER-444-643; 5-ER-645-782, 783-927; 6-ER-929-1111. Petitioners have worked many decades to protect the health, safety and environmental quality of the rural communities the Project would impact. 2-ER-6-7; 4-ER-447. From the vantage point of her adjacent ranch, Petitioner Ms. Tisdale regularly observes both fixed wing and rotary aircraft operated by the military and Homeland Security, as well as commercial and private aircraft, flying low over the Project site. 2-ER-6-7. These aircraft often pass directly over the Project site at very low altitudes. *Id*. (illustrative photographs by Ms. Tisdale of low-flying aircraft she routinely observes over the Project site).

As discussed, the FAA acknowledged the validity of Petitioners' previous administrative Petition for Review. 3-ER-179-412. That petition identified numerous aviation hazards from the Project's 60 massive turbines. *Id*. The FAA's December 2, 2020 ruling granting that petition confirmed its review had been incomplete. 2-ER-176-177. Its remand for further review (2-ER-173-174), however, did not address many grave issues of public safety. Because those issues remain, they still need to be addressed by the FAA on this Court's remand.

### III. THE FAA GRANTED PETITIONERS' FIRST ADMINISTRATIVE PETITION FOR REVIEW IN 2021

The determinations for the 72 turbines were originally issued on July 16, 2020. *E.g.* 4-ER-414-421, 422-429. However, on August 17, 2020 Petitioners challenged the DNHs in a 234-page Petition for Review. 3-ER-179-412. In response, the FAA's reviewing official found significant errors in the DNHs. 2-ER-173-174. In his decision issued December 2, 2020, George Gonzales, Acting Manager, Rules and Regulations, found the following:

> "*Our examination of the issued determination and petition revealed that the Obstruction Evaluation Group (OEG) did not follow established process and procedures during the aeronautical studies.* FAA Order 7400.2, Procedures for Handling Airspace Matters, paragraph 6-3-8 provides guidance on evaluating effect on VFR operations. Paragraph 6-3-8 b 8 states, in part, "pilots operating VFR frequently fly routes that follow rivers, coastlines, mountain passes, valleys, and similar types of natural landmarks or major highways, railroads, power lines, canals, and other manmade structures." *The project is situated directly between several airports used by general aviation aircraft, yet the determination states, "no data was available or received during the aeronautical study to indicate the wind farm would be located near a regularly and continuously used VFR en-route VFR flyway". There is no data in the case file to support any type of query into VFR flight with the air traffic facility, through radar data analysis, or with outside entities. Absent any type of documentation to support this finding, we dispute any claim that there is no data available within or outside of the FAA concerning VFR flight.*
>
> Paragraph 6-3-17 provides guidance for circularization. Paragraph [6-3-17(c)] states, in part, public notices should be distributed to those who can provide information needed to assist in evaluating the aeronautical effect of the structure. *As a minimum, the following governmental agencies, organizations, and individuals should be included on distribution lists* due to their inherent aeronautical interests: 'All known aviation interested persons and groups such as state, city, and local aviation authorities; airport authorities; various military organizations within the DOD; flying clubs; national, state, and local aviation organizations; flight schools; fixed base operators; air taxi, charter flight offices; and *other organizations or individuals that demonstrate a specific aeronautical interest such as county judges and city mayors.'* We could not find any distribution to many of the entities listed above, including flying clubs, flight schools, or local aviation organizations.
>
> With this in mind, please take the following actions:

> • Rescind the issued determinations for 2019-WTW-4517 through 4592-OE.
>
> • *Initiate a new public notice with dissemination to all entities listed in FAAO 7400.2, paragraph [6-3-17(c)].*
>
> • Restudy the proposal with any new comments.
>
> • Contact the local air traffic facilities for feedback concerning VFR flyways and operations in the vicinity of the proposed wind farm. Air traffic facilities can provide traffic counts and radar data to evaluate VFR traffic in the area of the planned construction.
>
> • Ensure that all coordination and analyses are uploaded into the aeronautical study files."

2-ER-173-174 (emphasis added).

## IV.  THE FAA ERRONEOUSLY EXCLUDED PETITIONERS FROM ITS SECOND PUBLIC REVIEW PROCESS

Because the "FAA did not ensure the public circularization notice was issued in accordance with FAA Order 7400.2 and also did not adequately validate en route VFR traffic counts," the FAA circularized notice of the Project again on April 7, 2021– but did not include Petitioners among those receiving the notice.  Motion  to Augment, Exhibit 1.

Despite the Project's risks to aviation safety, the FAA once again issued blanket Determination Letters that again declared there would be no "substantial adverse effect on the safe and efficient utilization of the navigable airspace . . . and would not be a hazard to air navigation," in reliance upon analyses and responses to comments that are identical in each letter.  *E.g.*, 2-ER-110-111.

But as discussed above, the evidence before the FAA shows that the Project poses significant hazards to aviation, including obstructions to VFR air lanes particularly in low-ceiling situations, degraded radar, turbulence from the turbine vortices, increases in en route altitudes subject to dangerous icing hazards, impeded aerial firefighting, and other impacts the FAA never analyzed.  Had the FAA

23

accepted and considered Petitioners' administrative Petition for Review, then the FAA would have had to address these Project impacts. For the reasons detailed below, this Petition for Review should be granted and the FAA directed to accept and consider Petitioners' administrative Petition for Review, and address the serious safety concerns it raises.

## V. THE FAA ERRONEOUSLY REJECTED PETITIONERS' REQUEST THAT IT EITHER REOPEN ITS SECOND COMMENT PERIOD AND ALLOW THEIR COMMENTS, OR ALLOW THEIR ADMINISTRATIVE PETITION FOR REVIEW

The FAA rejected Petitioners' September 20, 2021 administrative Petition for Review on the sole grounds that, notwithstanding Petitioners' submission on January 30, 2020 of a 666-page set of detailed comments on the Project during the FAA's original comment period (4-ER-444-643, 5-ER-645-782 (comments and Exhibit 1); 5-ER-783-927, 6-ER-929-1111 (Exhibits 2-8)); and Petitioners' submission of a 234-page administrative Petition for Review of the FAA's original Determination Letters on August 17, 2020 (3-ER-179-412), Petitioners did not submit a second, separate set of comments during the FAA's second comment period. 1-ER-2 (Notice of Invalid Petition Received, dated October 15, 2021).

The reason Petitioners did not submit a second round of comments, however, is that the FAA failed to afford Petitioners notice of that comment period. Motion to Augment, Exhibit 1. The FAA's Agency Record contains no record of the FAA's transmittal of any notice to Petitioners of this second comment period because notice was never provided.

Consequently, promptly after receiving the FAA's Notice of Invalid Petition Received, on October 25, 2021 Petitioners wrote to the FAA advising that Petitioners had not been given notice of the FAA's second comment period, and requesting reconsideration of the FAA's refusal to consider Petitioners' September

30, 2021 Petition for Review.  2-ER-4-99; Motion to Augment, Exhibit 1.

Petitioners stated:

> "We received your October 15, 2021 Notice of Invalid Petition Received, dismissing our September 30, 2021 Petition for Review by Backcountry Against Dumps, Donna Tisdale, and Joe "Ed" Tisdale Regarding No Hazard to Air Navigation Determinations for 72 Turbines Associated with the Campo Wind Project.  After review, we believe that the Notice of Invalid Petition is incorrect.  Neither our office nor our client received notice of the aeronautical study, as required under FAA Order 7400.2.  Therefore, we were never afforded an opportunity to comment on the study.  Pursuant to Code of Federal Regulations, title 14, part 77.37(a), 'any person who has a substantial aeronautical objection to [proposed construction] but was not given the opportunity to state it, may petition the Administrator within 30 days after the issuance of the determination.'
>
> Please provide information on the procedures for appealing your October 15, 2021 Notice of Invalid Petition to our office at the above address.  Alternatively, please rescind the October 15, 2021 Notice of Invalid Petition and proceed with discretionary review of the FAA's Determination of No Hazard, pursuant to Code of Federal Regulations, title 14, parts 77.37 and 77.41.  Please also acknowledge receipt of this letter and advise of your decision on our request."

*Id.*

On October 26, 2021, the FAA responded by reiterating its previous claim

that Petitioners' Petition for Review was invalid and refusing to reconsider its

decision:

> "Thank you for your letter. The FAA reviewed the subject aeronautical studies and petition in accordance with Title 14 Code of Federal Regulations, part 77 and affirmed *your petition is invalid because no comments were submitted during the public comment period*. There are no further actions the FAA can take under part 77.
>
> Be advised that 49 United States Code, Section 46110. Judicial review, allows for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the Court of Appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed no later than 60 days after the order is issued."

Motion to Augment, Exhibit 2 (emphasis added).

Consequently, Petitioners were never afforded an opportunity to comment on

the FAA's aeronautical study, notwithstanding its obvious significance to them.

Since the FAA refused to reopen its internal review and allow Petitioners to proceed with their petition, Petitioners were left no choice but to seek this Court's review.

The FAA's failure to afford Petitioners the opportunity to review and comment on the aeronautical study on which its Determination Letters were based conflicts with the criteria set forth in the FAA's governing regulation, FAA Order 7400.2. Petitioners explained to the FAA that under its own controlling guidance, Petitioners were entitled to notice of and the opportunity to comment on the FAA's aeronautical study of the Project's potential hazard to aviation safety. As Petitioners noted in their email to the FAA, Motion to Augment at Exhibit 1, FAA Order 7400.2, subpart 6-3-17(c), provides as follows:

> "As a minimum, the following governmental agencies, organizations, and individuals should be included on distribution lists [for public notices of aeronautical determinations] due to their inherent aeronautical interests: . . . As appropriate, state and local authorities; *civic groups; organizations; and individuals who do not have an aeronautical interest, but may become involved in specific aeronautical cases, must be included in the notice distribution, and given supplemental notice of actions and proceedings* on a case-by-case basis. Those involved should clearly understand that the public notice is to solicit aeronautical comments concerning the physical effect of the structure on the safe and efficient use of airspace by aircraft."

*Id.* (emphasis added). Confirming the importance of identifying persons with the requisite interests entitling them to notice, subsection (d) further requires the FAA to "[d]ocument and place in the obstruction evaluation file the names of each person and/or organizations to which public notice was sent." FAA Order 7400.2, paragraph 6-3-17(d).

Having submitted a lengthy and detailed comment on the FAA's original aviation obstruction analysis for the Project in 2020, Petitioners clearly demonstrated they were deeply "involved in [this] specific aeronautical case[]," and thus under the FAA's own regulation governing public notice, entitled to be

"included in the [FAA] notice distribution." *Id*.

Any lingering doubt about Petitioners' intense interest in this "specific aeronautical case" sufficient to entitle them to notice of the FAA's further aeronautical reviews was surely dispelled when Petitioners followed up their previous detailed comments on this Project with their equally detailed, 234-page administrative Petition for Review on August 17, 2020. 3-ER-179-412. The FAA acknowledged the procedural propriety of this Petition when, after scrutiny, the FAA's reviewing office declared it to be "valid." 2-ER-176-177.

The substantive as well as procedural merit of Petitioners' administrative Petition for Review was confirmed on December 2, 2020, when as noted, the FAA granted Petitioners' previous administrative Petition for Review. 2-ER-175. As detailed above, the FAA Rules and Regulations Manager directed the FAA to rescind its initial determination that this Project posed no hazard to aviation, citing a host of procedural and substantive defects in the FAA's initial determination. 2-ER-173-174.

Thus, under the facts documented in the FAA's own records of its review in this case, Petitioners unquestionably qualified as a "civic group[]; organization[]; and individuals" who "must be included in the notice distribution" of the FAA's aeronautical studies because they had demonstrated not just once, but repeatedly, that they were acutely interested in and thus "may become involved in" this "specific aeronautical case[]." FAA Order 7400.2, subpart 6-3-17(c).

The FAA's governing regulation, 14 C.F.R. § 77.31(a), imposes an even broader and more inclusive duty to afford notice and an opportunity for public comment on FAA aeronautical studies of the potential aviation hazards posed by obstacles to navigation such as the Project. Section 77.31(a) requires the FAA to provide notice of its aeronautical studies concerning the potential hazards posed by

27

proposed projects to "all known interested persons." Petitioners plainly qualify as "known interested persons" by dint of their submission of highly detailed and carefully researched comments on the Project on January 30, 2020. 4-ER-444-643; 5-ER-645-782. As noted, Petitioners reconfirmed their deep and abiding interest in the FAA's review of this Project by submitting their lengthy first administrative Petition for Review on August 17, 2020. 3-ER-179-412.

Likewise, 14 C.F.R.§ 77.37(a) provides that "any person who has a substantial aeronautical objection to [proposed construction] *but was not given the opportunity to state it*, may petition the Administrator within 30 days after the issuance of the determination." *Id*. (emphasis added).

Notwithstanding Petitioners' prompt submission of their administrative Petition for Review in full compliance with section 77.37(a), the FAA refused to abide by its own prescribed review procedure, leaving Petitioners no option but to seek this Court's review and intervention.

## SUMMARY OF ARGUMENT

This Petition for Review asks this Court to rule that:

1.    The FAA had a duty to provide Petitioners notice of the FAA's second comment period and failed to provide that required notice, violating its duty to do so; and

2.    The FAA had a duty to accept Petitioners' timely administrative Petition for Review and yet refused to do so, violating its duty to accept, review and take action on that petition.

## STANDARD OF REVIEW

This Court's standard of review is twofold. First, on questions posing purely or predominantly legal issues, this Court must exercise its independent judgment, as

the review is *de novo*.  *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997); 5
U.S.C. § 706(2)(A)-(D).  Second, on questions of fact, the standard of review is
whether the agency's rulings are "clear error."  *Husain v. Olympic Airways*, 316
F.3d 829, 835 (9th Cir. 2002), aff'd, 540 U.S. 644, 124 S.Ct. 1221 (2004).

A question of law is presented as to whether the FAA correctly applied the
laws governing its procedures for review, comment and administrative appeals by
interested and impacted members of the public such as Petitioners on the FAA's
review and approval of the Project.  Accordingly, this Court exercises *de novo*
review of this issue.

## ARGUMENT

## I.    THE FAA MUST COMPLY WITH  ITS PUBLIC NOTICE RULES

It is well established that agencies must abide by their own regulations, as
they have the full "force and effect of law."  *Perez v. Mortgage Bankers
Association*, 575 U.S. 92, 96 (2015).  "Rules issued through the
notice-and-comment process," like regulations, similarly "have the 'force and effect
of law.'"  *Id*.  Nearly seventy years ago, the Supreme Court held that where an
agency charged with implementing a statutory command does so by adopting
regulations that fall within the scope of the statutory authorization, those regulations
are as fully enforceable as the statute itself.  In *United States ex rel. Accardi v.
Shaughnessy*, 347 U.S. 260, 265-265 (1954), the Supreme Court admonished the
Attorney General for side-stepping legally prescribed procedures that delegated
immigration case review to the Board of Immigration.  The high Court held that
since in that case "the regulations delegate to the Board discretionary authority as
broad as the statute confers on the Attorney General[,] the scope of the Attorney
General's discretion became the yardstick of the Board's."  *Id.* at 266.  In other
words, duly authorized regulations hold the same force and effect as the statute

under which they are authorized.  Consequently in that case, the delegating agency – the Attorney General – and the agency tasked with carrying out the regulations – the Board of Immigration – were both bound by those regulations.  *Id*.; *accord, Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959).  Failure to abide by those *mandatory* procedures is reviewable under the Administrative Procedure Act.  5 U.S.C. §§ 701-706.

The FAA is therefore bound by its own regulations, which may be enforced by this Court.  As discussed throughout this brief, those regulations require the FAA to notify interested parties, including Petitioners, of the FAA's proposed determinations whether proposed projects pose hazards to air navigation.

Codified in Title 14, Part 77 of the Code of Federal Regulations, the FAA's regulations require the FAA to "advise all known interested persons" of its proposed and adopted aviation hazard determinations.  14 C.F.R. § 77.31.  Directly relevant and controlling here, section 77.37 grants to interested persons such as Petitioners the right to file a Petition for Review if, as in this case,  that interested person was not afforded an opportunity to state its objections to such a determination.  14 C.F.R. § 77.37.  These regulations are binding on the FAA, and its failure to comply with them – resulting in harm to Petitioners – is subject to this Court's review and correction.

The FAA's Procedures for Handling Airspace Matters, prescribed in FAA JO Order 7400, are likewise binding on the FAA.  Because such FAA orders are adopted pursuant to a formal protocol involving a 30-day notice-and-comment period, they have the "force and effect of law."  *Hartz v. United States*, 387 F.2d 870, 874 (5th Cir. 1968); *Lightenburger v. United States*, 298 F.Supp. 813, 829 (C.D.Cal. 1969) (reversed on other grounds).  In *Hartz*, the court held an air traffic controller liable for failing to give the proper warning required by the Air Traffic

30

Control Procedures, which are prescribed by FAA JO Order 7110.65. *Hartz*, 387 F.2d at 874.

The court in *Lightenburger* discussed the binding nature of FAA Orders in greater detail. It held that "[w]hile it does not appear that the Air Traffic Control Procedures Manual was ever published in the Federal Register in a manner required to give it the force and effect of law in all respects, nevertheless it does have the force and effect of law *in governing the FAA*." *Lightenburger*, 298 F.Supp. at 829 (emphasis added).

So too here, the pertinent air navigation procedures are prescribed in FAA JO Order 7400.2. Those procedures are the definitive guidebook for determining hazards to air navigation. *United States v. Miller*, 303 F.2d 703, 710 fn. 16 (9th Cir. 1962) (Air Traffic Control Procedures are the "Bible for Tower Operators"). Furthermore, FAA JO Order 7400.2 was available for public review for 30 days on the FAA website prior to its effective date, providing an opportunity for public review. JO 7400.2N, Paragraph 1-1-2. While the Airspace Matters Procedures were not published in the Federal Register, that is not relevant to whether they are binding on the FAA itself. They are. As the court held in *Lightenburger*, these Procedures "have the force and effect of law *in governing the FAA.*" *Lightenburger*, 298 F.Supp. at 829 (emphasis added).

Unlike FAA regulations or the mandatory procedures that are issued through FAA Orders – both of which have the force and effect of law – the FAA also issues Advisory Circulars. As their name suggests, Advisory Circulars are not mandatory. Because they are strictly *advisory*, courts have recognized that they do *not* have the force and effect of law. In *Sierra Pacific Holdings, Inc. v. County of Ventura* (2012) 204 Cal.App.4th 509, 517, for example, the California Court of Appeal held that because FAA Advisory Circulars "are merely *advisory* guidelines, they cannot

31

constitute paramount federal law that preempts state law. . . . [T]he FAA's *nonmandatory* standards in the Advisory Circular are not regulations and do not have the force and effect of law." *Id*. (emphasis added). This "merely advisory" status of the Advisory Circulars stands in a stark contrast to the mandatory nature and effect of the FAA regulations and orders discussed above, which *do* have "the force and effect of law." *Id*.

Congress has provided in 49 U.S.C. section 44718 the standards governing the FAA's procedures for considering public comments on such determinations. Section 44718 directs in pertinent part:

(a) Notice. – By regulation or by order when necessary, *the Secretary of Transportation shall require a person to give adequate public notice,* in the form and way the Secretary prescribes, of the construction, alteration, establishment, or expansion, or *the proposed construction, alteration, establishment, or expansion, of a structure* or sanitary landfill *when the notice will promote -*

(1) *safety in air commerce*;

(2) the efficient use and preservation of the navigable airspace and of airport traffic capacity at public-use airports; or

(3) the interests of national security, as determined by the Secretary of Defense.

(b) Studies. –

(1) In general. – Under regulations prescribed by the Secretary, *if the Secretary decides that constructing or altering a structure may result in an obstruction of the navigable airspace,* an interference with air and space navigation facilities and equipment or the navigable airspace, or, after consultation with the Secretary of Defense, an adverse impact on military operations and readiness, *the Secretary of Transportation shall conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace*, facilities, or equipment. In conducting the study, the Secretary shall –

(A) consider factors relevant to the efficient and effective use of the navigable airspace, including –

(i) *the impact on arrival, departure, and en route procedures for aircraft operation under visual flight rules*;

> (ii) *the impact on arrival, departure, and en route procedures for aircraft operation under instrument flight rules*;
>
> **\*\*\*\***
>
> (vii) other factors relevant to the efficient and effective use of navigable airspace . . . .
>
> (2) Report. – *On completing the study, the Secretary of Transportation shall issue a report disclosing the extent of the –*
>
> > (A) *adverse impact on the safe and efficient use of the navigable airspace* that the Secretary finds will result from constructing or altering the structure . . . .

49 U.S.C. § 44718 (emphasis added).

Pursuant to its statutory authority, the FAA has, in turn, adopted procedures for public review and comment on determinations as to whether proposed structures pose a hazard to air navigation and public safety in 14 C.F.R. Part 77. Section 77.17 defines an obstruction to air navigation as follows:

"(a) An existing object, including a mobile object, is, and a future object would be an obstruction to air navigation if it is of greater height than any of the following heights or surfaces:

> (1) A height of 499 feet AGL [above ground level] at the site of the object.
>
> **\*\*\*\***

14 C.F.R. § 77.17(a). All of the wind turbines proposed by the Project exceed this threshold, as they are 586 feet high. 2-ER-106.

As noted previously, section 77.37 grants interested parties who were not given an opportunity to state their substantive aeronautical comment on a proposal that would pose a potential hazard to air navigation the right to petition the FAA for discretionary review of a determination that the proposal would not pose a hazard to air navigation:

(a) *If you* are the sponsor, *provided a substantive comment* on a proposal in an

aeronautical study, *or have a substantive aeronautical comment on the proposal but were not given an opportunity to state it, you may petition* the FAA for a discretionary review of a determination, revision, or extension of a determination issued by the FAA."

14 C.F.R. § 77.37(a) (emphasis added).

Section 77.39 prescribes the procedure, required contents and effect of administrative petitions for review of FAA determinations:

> (a) You must file a petition for discretionary review in writing and it must be received by the FAA *within 30 days after the issuance of a determination* under [14 C.F.R.] § 77.31, or a revision or extension of the determination under § 77.35.

> (b) The petition *must contain a full statement of* the aeronautical basis on which the petition is made, and must include new information or facts not previously considered or presented during the aeronautical study, including *valid aeronautical reasons why the determination, revisions, or extension made by the FAA should be reviewed*.

> \*\*\*\*

> (d) *The FAA will inform the petitioners* or sponsor (if other than the petitioner) and the FCC (whenever an FCC-related proposal is involved) of the filing of the petition and *that the determination is not final pending disposition of the petition."*

14 C.F.R. § 77.39 (emphasis added). Petitioners' administrative Petition for Review satisfies the criteria prescribed in subsections (a) and (b).

Congress has provided further, in 49 U.S.C. section 46110, for this Court's review of the FAA's final decision on an administrative petition for review to assure that the FAA abides by its rules governing its review of applications for its determination that obstructions to navigable airspace pose no hazard to navigation safety. Section 46110 directs in pertinent part that:

> (a) Filing and venue. – Except [for circumstances not present here], *a person disclosing a substantial interest in an order issued by the Secretary of Transportation . . . .in whole or in part under this part . . . .* may apply for review of the order by filing a petition for review in the . . . court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued.

*Id*. (emphasis added). Petitioners satisfy each of the foregoing criteria for review.

In exercising its authority to enforce the FAA's rules and regulations in reviewing challenges to the FAA's decisionmaking, this Court conducts its review according to the standards set forth in the Administrative Procedure Act. 5 U.S.C. section 706(1), (2)(A)-(D). Those standards direct that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Further,

"the reviewing court *shall*—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and *set aside agency action*, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise *not in accordance with law*;

> (B) contrary to constitutional right, power, privilege, or immunity;

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D) *without observance of procedure required by law*;

****

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

5 U.S.C. § 706(2)(A)-(D) (emphasis added).

In summary, it is axiomatic that an agency must comply with its formally adopted regulations and rules requiring public notice to interested persons before it may issue discretionary approvals governed by statutory and regulatory standards. Congress has provided in 49 U.S.C. section 44718 the standards governing the FAA's procedures for considering public comments on such determinations. Pursuant to its

statutory authority, the FAA has, in turn, adopted procedures for public review and comment on its determinations whether proposed structures pose a hazard to air navigation and public safety in 14 C.F.R. sections 77.37 through 77.39 and FAA JO Order 7400.2. Those procedures provide that Petitioners receive notice of and be afforded an opportunity to comment upon the FAA's proposed determinations of whether a project will obstruct and pose a hazard to aviation safety. They also require that interested parties such as Petitioners be allowed to file an administrative Petition for Review of those determinations if, as here, they were not afforded an opportunity to state their objections to such determinations during the FAA's review process.

Congress has confirmed its intent that this Court afford a judicial remedy to persons who are harmed by FAA determinations regarding hazards to aviation safety. Congress provided in 49 U.S.C. section 46110 for this Court's review of such determinations to assure that the FAA abides by its rules governing review of applications for its determination that obstructions to navigable airspace pose no hazard to navigation safety. In exercising its authority to enforce the FAA's rules and regulations in response to challenges to the FAA's decisionmaking, this Court conducts its review according to the standards set forth in the Administrative Procedure Act. 5 U.S.C. section 706(1), (2)(A)-(D).

## II. THE FAA FAILED TO COMPLY WITH ITS PUBLIC NOTICE AND ADMINISTRATIVE REVIEW RULES

The FAA failed to comply with its public notice and administrative review rules in two significant respects.

First, the FAA failed to afford Petitioners notice of the comment period on the FAA's second issuance of notices of its determination that the Project posed no hazards to aviation safety. Motion to Augment, Exhibit 1. As explained above, the

FAA is required by its own regulations to "advise all known interested persons" of its proposed and adopted aviation hazard determinations. 14 C.F.R. § 77.31. Petitioners were entitled to notice of the FAA's second comment period on the Project because, as shown, they more than adequately demonstrated their keen interest in the Project's impacts on aviation safety.

Second, the FAA denied Petitioners an opportunity to file their administrative Petition for Review challenging the FAA's second issuance of Determination Letters concluding that the Project posed no hazards to aviation safety. 1-ER-2; Motion to Augment, Exhibit 2. As discussed above, the FAA is required by its own regulations to provide interested persons such as Petitioners the right to file a Petition for Review of the FAA's determination that a project posed no hazards to aviation safety where, as here, they were not given notice of the comment period nor provided an opportunity to state their objections to that determination. 14 C.F.R. § 77.37. Petitioners were entitled to file their second administrative Petition for Review because they were not given that required notice and an opportunity to state their objections to the FAA's Letter Determinations approving the Project.

In particular, section 77.37 grants interested parties who were not given an opportunity to state their substantive aeronautical comment on a proposal that would pose a potential hazard to air navigation the right to petition the FAA for discretionary review of a determination that the proposal would not pose such a hazard:

> (a) *If you* are the sponsor, *provided a substantive comment* on a proposal in an aeronautical study, *or have a substantive aeronautical comment on the proposal but were not given an opportunity to state it, you may petition the FAA for a discretionary review of a determination*, revision, or extension of a determination issued by the FAA."

14 C.F.R. § 77.37(a) (emphasis added).

Petitioners qualify under these criteria on two independent grounds. First,

Petitioners "provided a substantive comment" on the Project, since they previously submitted detailed comments during the FAA's original review of the Project that prompted, together with Petitioners' subsequent administrative Petition for Review, the FAA's rescission of its initial Determination Letters for the Project. 2-ER-173-174 (FAA remand memorandum vacating the FAA's original Determination Letters for the Project), 175 (FAA remand letter to Petitioners), 176-177 (FAA determination that petition was "valid"); 3-ER-179-412 (Petition for Review).

Second, Petitioners have substantive aeronautical comments to make on the Project as set forth in their second administrative Petition for Review, but were unable to state those comments. Petitioners timely submitted substantive aeronautical comments to the FAA on September 30, 2021. 2-ER-4-99, 100. However, they were "not given an opportunity to state [them]" during the FAA's second comment period because they were never given notice of that second comment period. Motion to Augment, Exhibits 1 and 2.

Accordingly, the FAA failed to comply with its rules governing public notice and administrative review of its Determination Letters for the Project.

## III. BECAUSE THE FAA FAILED TO COMPLY WITH ITS PUBLIC NOTICE RULES, PETITIONERS NEVER RECEIVED NOTICE OF THE FAA'S COMMENT PERIOD FOR ITS SECOND ROUND OF AERONAUTICAL STUDIES

Petitioners never received notice of this second comment period because the FAA failed to afford Petitioners notice of that comment period. Petitioners did not learn of the FAA's second comment period for the Project until after that comment period had closed on May 15, 2021. 2-ER-171; Motion to Augment, Exhibit 1. Petitioners timely submitted their administrative Petition for Review of the FAA's issuance of its second set of Determination Letters for the Project to the FAA on September 30, 2021, within 30 days after the FAA had issued those Determination

Letters on August 31, 2021. 2-ER-4-99 (Petitioners' administrative Petition for Review), 100 (Petitioners' transmittal of their administrative Petition for Review), 101-114 (Determination Letters).

Consequently, promptly after receiving the FAA's "Notice of Invalid Petition Received" on October 15, 2021 (1-ER-2), on October 25, 2021 Petitioners told the FAA that they had not received notice of the FAA's second comment period, and requested reconsideration of the FAA's rejection of Petitioners' administrative Petition for Review. 2-ER-4-99; Motion to Augment, Exhibit 1. Petitioners stated:

> "We received your October 15, 2021 Notice of Invalid Petition Received, dismissing our September 30, 2021 Petition for Review by Backcountry Against Dumps, Donna Tisdale, and Joe "Ed" Tisdale Regarding No Hazard to Air Navigation Determinations for 72 Turbines Associated with the Campo Wind Project. After review, we believe that the Notice of Invalid Petition is incorrect. Neither our office nor our client received notice of the aeronautical study, as required under FAA Order 7400.2. Therefore, we were never afforded an opportunity to comment on the study. Pursuant to Code of Federal Regulations, title 14, part 77.37(a), 'any person who has a substantial aeronautical objection to [proposed construction] but was not given the opportunity to state it, may petition the Administrator within 30 days after the issuance of the determination.'
>
> Please provide information on the procedures for appealing your October 15, 2021 Notice of Invalid Petition to our office at the above address. Alternatively, please rescind the October 15, 2021 Notice of Invalid Petition and proceed with discretionary review of the FAA's Determination of No Hazard, pursuant to Code of Federal Regulations, title 14, parts 77.37 and 77.41. Please also acknowledge receipt of this letter and advise of your decision on our request."

*Id.* Petitioners' requests were rejected, as discussed below.

## IV. BECAUSE PETITIONERS WERE NOT PROVIDED NOTICE OF THE FAA'S SECOND COMMENT PERIOD, PETITIONERS WERE PREVENTED FROM SUBMITTING THEIR COMMENTS AND FILING THEIR ADMINISTRATIVE PETITION FOR REVIEW.

The FAA rejected Petitioners' September 30, 2021 administrative Petition for Review on the sole grounds that, notwithstanding Petitioners' submission on January 30, 2020 of a 666-page set of detailed comments on the Project during the

FAA's original comment period (4-ER-444-643, 5-ER-645-782 (comments and Exhibit 1); 5-ER-783-927, 6-ER-929-1111 (Exhibits 2-8 to comments)), and Petitioners' submission of a 234-page administrative Petition for Review of the FAA's original Letter Determinations for the Project on August 17, 2020 (3-ER-179-412), Petitioners did not submit a second, separate set of comments during the FAA's second comment period. 1-ER-2 ("Notice of Invalid Petition Received," dated October 15, 2021).

As explained above, Petitioners had not submitted comments during the FAA's second comment period because the FAA had not provided notice of that comment period to Petitioners notwithstanding its knowledge that Petitioners were "known interested persons" entitled to notice of that comment period. 14 C.F.R. § 77.31.

## V. BECAUSE PETITIONERS WERE NOT GIVEN AN OPPORTUNITY TO SUBMIT THEIR COMMENTS ON THE PROJECT, THE FAA WAS REQUIRED TO AFFORD PETITIONERS THE RIGHT TO PETITION THE FAA TO REVIEW ITS DETERMINATION THAT THE PROJECT POSED NO HAZARD TO NAVIGATION SAFETY

After advising the FAA on October 25, 2021 that the grounds for its rejection of Petitioners' administrative Petition for Review were incorrect, Petitioners received the FAA's reply refusing to reconsider its decision. The FAA stated:

> "Thank you for your letter. The FAA reviewed the subject aeronautical studies and petition in accordance with Title 14 Code of Federal Regulations, part 77 and affirmed *your petition is invalid because no comments were submitted during the public comment period*. There are no further actions the FAA can take under part 77.
>
> Be advised that 49 United States Code, Section 46110, Judicial review, allows for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the Court of Appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed no later than 60 days after the order is issued."

Motion to Augment, Exhibit 2 (emphasis added).

Since the FAA refused to reopen its internal review and allow Petitioners to proceed with their administrative Petition for Review, Petitioners were never afforded an opportunity to comment on the FAA's aeronautical study.

The FAA's failure to afford Petitioners the opportunity to review and comment on its aeronautical study conflicts with the criteria set forth in the FAA's governing regulation, 14 C.F.R. § 77.31, and its governing rule, FAA Order 7400.2. Petitioners explained to the FAA that under its own controlling guidance, Petitioners were entitled to notice of and the opportunity to comment on the FAA's aeronautical study. As Petitioners noted in their October 25, 2021 email to the FAA, FAA Order 7400.2, subpart 6-3-17(c), directs:

> "As a minimum, the following governmental agencies, organizations, and individuals should be included on distribution lists [for public notices of aeronautical determinations] due to their inherent aeronautical interests: . . . As appropriate, state and local authorities; *civic groups; organizations; and individuals who do not have an aeronautical interest, but may become involved in specific aeronautical cases, must be included in the notice distribution*, and given supplemental notice of actions and proceedings on a case-by-case basis. Those involved should clearly understand that the public notice is to solicit aeronautical comments concerning the physical effect of the structure on the safe and efficient use of airspace by aircraft."

Motion to Augment, Exhibit 1 (emphasis added). Confirming the importance of identifying persons entitled to notice, paragraph 6-3-17, subsection (d) further requires the FAA to "[d]ocument and place in the obstruction evaluation file the names of each person and/or organizations to which public notice was sent." FAA Order 7400.2, paragraph 6-3-17(d).

Having submitted a lengthy and detailed comment on the FAA's original aviation obstruction analysis for the Project in 2020, Petitioners clearly demonstrated they were deeply "involved in [this] specific aeronautical case[]," and

thus under the FAA's regulation governing public notice, entitled to be "included in the [FAA] notice distribution." *Id.*

Petitioners' profound interest in this "specific aeronautical case" sufficient to entitle them to notice of the FAA's further aeronautical reviews was demonstrated again when Petitioners filed their 234-page administrative Petition for Review on August 17, 2020. 3-ER-179-412. The FAA determined this petition was "valid." 2-ER-176-177.

The merit of Petitioners' petition was confirmed on December 2, 2020, when as discussed above, the FAA's Acting Manager, Rules and Regulations Group, granted the petition and directed the FAA to rescind its determination that the Project posed no hazard to aviation, citing a host of procedural and substantive defects. 2-ER-173-174, 175.

Thus, under the facts documented in the FAA's own records of its review in this case, Petitioners unquestionably qualified as a "civic group[]; organization[]; and individuals" who "must be included in the notice distribution" of the FAA's aeronautical studies because they had demonstrated not just once, but repeatedly, that they "may become involved in" this "specific aeronautical case[]." FAA Order 7400.2, subpart 6-3-17(c).

Petitioners also qualified under the FAA's governing regulation, 14 C.F.R. § 77.31(a), as it imposes an even broader and more inclusive duty to afford notice and an opportunity to comment to the public on FAA aeronautical studies. As noted above, section 77.31(a) requires the FAA to provide notice of its aeronautical studies to "all known interested persons." Petitioners plainly qualify as "known interested persons" because they submitted highly detailed and carefully researched comments on the Project on January 30, 2020 (4-ER-444-643; 5-ER-645-782) and a lengthy administrative Petition for Review of the FAA's original Letter

Determinations for the Project on August 17, 2020 (3-ER-179-412).

Moreover, as noted Petitioners also qualify under 14 C.F.R. § 77.37(a), which mandates that "any person who has a substantial aeronautical objection to [proposed construction] *but was not given the opportunity to state it*, may petition the Administrator within 30 days after the issuance of the determination." *Id*. (emphasis added). Notwithstanding Petitioners' prompt submission of their administrative Petition for Review in full compliance with section 77.37(a), the FAA refused to abide by its own prescribed review procedure, impelling Petitioners to secure judicial review.

## VI. THIS COURT SHOULD VACATE THE FAA'S REFUSAL TO ALLOW PETITIONERS TO FILE THEIR ADMINISTRATIVE PETITION REQUESTING THE FAA'S REVIEW OF ITS DETERMINATION THAT THE PROJECT POSED NO HAZARD TO AVIATION SAFETY

The FAA failed to abide by its clear duty under its regulations to accept, review and act on Petitioners' timely and valid administrative Petition for Review. As noted, the FAA's pertinent regulation, codified in 14 C.F.R. § 77.37(a), provides that "any person who has a substantial aeronautical objection to [proposed construction] *but was not given the opportunity to state it*, may petition the Administrator within 30 days after the issuance of the determination." *Id*. (emphasis added).

Notwithstanding Petitioners' prompt submission of their administrative Petition for Review in full compliance with section 77.37(a), the FAA refused to abide by its own required review procedure, leaving Petitioners no option but to seek this Court's review and remand.

## CONCLUSION

This Petition for Review asks this Court to direct the FAA to allow Petitioners to file their second administrative Petition for Review. The statutes,

regulations and rules governing the FAA's consideration of such petitions clearly require it to accept for review Petitioners' timely and valid petition.

Granting this Petition for Review will serve not just the cause of justice, but equally important, the public's air safety. The Project poses potentially significant impacts on aircraft safety and operation, by: (1) erecting obstructions that will be particularly difficult for pilots to see at night (since the top of the turbine rotors' sweep will be 230 feet – twenty stories – higher than the single red light on the rotor's nacelle) (2) forcing aircraft to higher and colder altitudes where they will suffer greater risks of wing- and rotor-blade icing, (3) producing turbulence, (4) degrading radar function, and (5) impeding low flying aircraft including aerial firefighters, agricultural aircraft and glider pilots, among other hazards. The Project will pose an unacceptable risk of fatal aircraft collisions that cannot be eliminated by FAA-required lighting.

The significant risks to aviation safety identified by Petitioners' administrative Petition for Review should be considered by the FAA after a full and proper airing of the issues raised, and if appropriate, mitigation measures such as relocating the turbines or lowering their height should also be given consideration.

Petitioners are vitally concerned about the Project's impacts on aviation safety because they live directly beneath where any aircraft collisions would likely occur, and where resulting wildfires would start. For this reason, Petitioners made numerous good faith suggestions for further study and potential mitigation of the threats to aviation safety posed by the Project. But contrary to its own regulations, the FAA failed to afford Petitioners an opportunity to submit comments during the second, final comment period, and then refused to accept, consider and act on Petitioners' administrative Petition for Review on the grounds Petitioners did not submit the comments that the FAA's failure to provide notice prevented Petitioners

from submitting.

For these reasons, this Court should direct the FAA to comply with its own regulations and accept as "valid" Petitioners' improperly rejected administrative Petition for Review.

Dated: July 13, 2022                     Respectfully submitted,

                                         */s/ Stephan C. Volker*
                                         STEPHAN C. VOLKER
                                         Attorney for Petitioners Backcountry Against
                                         Dumps, Donna Tisdale, and Joe "Ed" Tisdale

## STATEMENT OF RELATED CASE

This case is related to *Backcountry Against Dumps, et al. v. Bureau of Indian Affairs, et al. (appeal pending*, Ninth Cir. Case No. 21-55869).

Dated:  July 13, 2022

                                         */s/ Stephan C. Volker*
                                         STEPHAN C. VOLKER

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 21-71426 |

I am the attorney or self-represented party.

**This brief contains** | 13,941 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Stephan C. Volker | **Date** | 07/13/2022 |

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/2018*

# ADDENDUM OF PERTINENT AUTHORITIES

**TABLE OF CONTENTS**

**Page(s)**

## <u>FEDERAL STATUTES</u>

United States Code, Title 5

§ 701. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 1
§ 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 3
§ 703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 4
§ 704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 5
§ 705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 6
§ 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 7

United States Code, Title 49

§ 44718. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 9
§ 46110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 13

## <u>FEDERAL REGULATIONS</u>

Code of Federal Regulations, Title 14

§ 77.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 15
§ 77.29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 17
§ 77.31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 19
§ 77.35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 21
§ 77.37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 23
§ 77.39. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 24
§ 77.41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Addendum 25

Addendum i

# **RULES**

Federal Aviation Administration Orders
    Procedures for Handling Airspace Matters,
    FAA Order JO 7400.2 (February 28, 2019). . . . . . . . . . . . . .  Addendum 26
        Paragraph 1-1-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 27
        Paragraph 6-3-3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 28
        Paragraph 6-3-4.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 28
        Paragraph 6-3-5.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 29
        Paragraph 6-3-8.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 31
        Paragraph 6-3-17.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 43

Federal Rules of Appellate Procedure
    Rule 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 45

Ninth Circuit Rules
    Rule 28-2.7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Addendum 46

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 701

§ 701. Application; definitions

Effective: January 4, 2011
Currentness

**(a)** This chapter applies, according to the provisions thereof, except to the extent that--

**(1)** statutes preclude judicial review; or

**(2)** agency action is committed to agency discretion by law.

**(b)** For the purpose of this chapter--

**(1)** "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include--

**(A)** the Congress;

**(B)** the courts of the United States;

**(C)** the governments of the territories or possessions of the United States;

**(D)** the government of the District of Columbia;

**(E)** agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

**(F)** courts martial and military commissions;

**(G)** military authority exercised in the field in time of war or in occupied territory; or

**(H)** functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; [1] and

**(2)** "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

### CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 103-272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub.L. 111-350, § 5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

### Footnotes

1  See References in Text note set out under this section.

5 U.S.C.A. § 701, 5 USCA § 701
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 702

§ 702. Right of review

Currentness

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 94-574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

5 U.S.C.A. § 702, 5 USCA § 702
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 703

§ 703. Form and venue of proceeding

Currentness

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392; Pub.L. 94-574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

5 U.S.C.A. § 703, 5 USCA § 703
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 4

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 704

§ 704. Actions reviewable

Currentness

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 392.)

5 U.S.C.A. § 704, 5 USCA § 704
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

**End of Document**                                            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 705

§ 705. Relief pending review

Currentness

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

5 U.S.C.A. § 705, 5 USCA § 705
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2022 Thomson Reuters. No claim to original U.S. Government Works. 1

Addendum 6

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limitation Recognized by  Krafsur v. Davenport,   6th Cir.(Tenn.),   Dec. 04, 2013

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 5. Government Organization and Employees (Refs & Annos)
      Part I. The Agencies Generally
         Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Addendum 7

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

5 U.S.C.A. § 706, 5 USCA § 706
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   2

Addendum 8

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle VII. Aviation Programs
      Part A. Air Commerce and Safety (Refs & Annos)
        Subpart III. Safety (Refs & Annos)
          Chapter 447. Safety Regulation (Refs & Annos)

49 U.S.C.A. § 44718

§ 44718. Structures interfering with air commerce or national security

Effective: October 5, 2018

Currentness

**(a) Notice.**--By regulation or by order when necessary, the Secretary of Transportation shall require a person to give adequate public notice, in the form and way the Secretary prescribes, of the construction, alteration, establishment, or expansion, or the proposed construction, alteration, establishment, or expansion, of a structure or sanitary landfill when the notice will promote--

**(1)** safety in air commerce;

**(2)** the efficient use and preservation of the navigable airspace and of airport traffic capacity at public-use airports; or

**(3)** the interests of national security, as determined by the Secretary of Defense.

**(b) Studies.**--

**(1) In general.**--Under regulations prescribed by the Secretary, if the Secretary decides that constructing or altering a structure may result in an obstruction of the navigable airspace, an interference with air or space navigation facilities and equipment or the navigable airspace, or, after consultation with the Secretary of Defense, an adverse impact on military operations and readiness, the Secretary of Transportation shall conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace, facilities, or equipment. In conducting the study, the Secretary shall--

**(A)** consider factors relevant to the efficient and effective use of the navigable airspace, including--

**(i)** the impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules;

**(ii)** the impact on arrival, departure, and en route procedures for aircraft operating under instrument flight rules;

**(iii)** the impact on existing public-use airports and aeronautical facilities;

**(iv)** the impact on planned public-use airports and aeronautical facilities;

**(v)** the cumulative impact resulting from the proposed construction or alteration of a structure when combined with the impact of other existing or proposed structures;

**(vi)** the impact on launch and reentry for launch and reentry vehicles arriving or departing from a launch site or reentry site licensed by the Secretary of Transportation; and

**(vii)** other factors relevant to the efficient and effective use of navigable airspace; and

**(B)** include the finding made by the Secretary of Defense under subsection (f).

**(2) Report.**-- On completing the study, the Secretary of Transportation shall issue a report disclosing the extent of the--

**(A)** adverse impact on the safe and efficient use of the navigable airspace that the Secretary finds will result from constructing or altering the structure; and

**(B)** unacceptable risk to the national security of the United States, as determined by the Secretary of Defense under subsection (f).

**(3) Severability.**--A determination by the Secretary of Transportation on hazard to air navigation under this section shall remain independent of a determination of unacceptable risk to the national security of the United States by the Secretary of Defense under subsection (f).

**(c) Broadcast applications and tower studies.**--In carrying out laws related to a broadcast application and conducting an aeronautical study related to broadcast towers, the Administrator of the Federal Aviation Administration and the Federal Communications Commission shall take action necessary to coordinate efficiently--

**(1)** the receipt and consideration of, and action on, the application; and

**(2)** the completion of any associated aeronautical study.

**(d) Limitation on construction of landfills.**--

**(1) In general.**--No person shall construct or establish a municipal solid waste landfill (as defined in section 258.2 of title 40, Code of Federal Regulations, as in effect on the date of the enactment of this subsection) that receives putrescible waste

(as defined in section 257.3-8 of such title) within 6 miles of a public airport that has received grants under chapter 471 and is primarily served by general aviation aircraft and regularly scheduled flights of aircraft designed for 60 passengers or less unless the State aviation agency of the State in which the airport is located requests that the Administrator of the Federal Aviation Administration exempt the landfill from the application of this subsection and the Administrator determines that such exemption would have no adverse impact on aviation safety.

**(2) Limitation on applicability.**--Paragraph (1) shall not apply in the State of Alaska and shall not apply to the construction, establishment, expansion, or modification of, or to any other activity undertaken with respect to, a municipal solid waste landfill if the construction or establishment of the landfill was commenced on or before the date of the enactment of this subsection.

**(e) Review of aeronautical studies.**--The Administrator of the Federal Aviation Administration shall develop procedures to allow the Department of Defense and the Department of Homeland Security to review and comment on an aeronautical study conducted pursuant to subsection (b) prior to the completion of the study.

**(f) National security finding.**--As part of an aeronautical study conducted under subsection (b) and in accordance with section 183a(e) of title 10, the Secretary of Defense shall--

**(1)** make a finding on whether the construction, alteration, establishment, or expansion of a structure or sanitary landfill included in the study would result in an unacceptable risk to the national security of the United States; and

**(2)** transmit the finding to the Secretary of Transportation for inclusion in the report required under subsection (b)(2).

**(g) Special rule for identified geographic areas.**--In the case of a proposed structure to be located within a geographic area identified under section 183a(d)(2)(B) of title 10, the Secretary of Transportation may not issue a determination pursuant to this section until the Secretary of Defense issues a finding under section 183a(e) of title 10, the Secretary of Defense advises the Secretary of Transportation that no finding under section 183a(e) of title 10 will be forthcoming, or 180 days have lapsed since the project was filed with the Secretary of Transportation pursuant to this section, whichever occurs first.

**(h) Definitions.**--In this section, the following definitions apply:

**(1) Adverse impact on military operations and readiness.**--The term "adverse impact on military operations and readiness" has the meaning given the term in section 183a(h)(1) of title 10.

**(2) Unacceptable risk to the national security of the United States.**--The term "unacceptable risk to the national security of the United States" has the meaning given the term in section 183a(h)(7) of title 10.

## CREDIT(S)

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1200; Pub.L. 104-264, Title XII, § 1220(a), Oct. 9, 1996, 110 Stat. 3286; Pub.L. 106-181, Title V, § 503(b), Apr. 5, 2000, 114 Stat. 133; Pub.L. 112-81, Div. A, Title III, § 332, Dec. 31, 2011, 125 Stat. 1369; Pub.L. 114-248, § 1(a), Nov. 28, 2016, 130 Stat. 998; Pub.L. 114-328, Div. A, Title III, § 341(a)(1) to (4)(A), Dec.

23, 2016, 130 Stat. 2079; Pub.L. 115-91, Div. A, Title III, § 311(b)(2), (3), (e), Dec. 12, 2017, 131 Stat. 1347, 1348; Pub.L. 115-232, Div. A, Title X, § 1081(e)(2), Aug. 13, 2018, 132 Stat. 1986; Pub.L. 115-254, Div. B, Title V, § 539(h), Oct. 5, 2018, 132 Stat. 3371.)

49 U.S.C.A. § 44718, 49 USCA § 44718

Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle VII. Aviation Programs
      Part A. Air Commerce and Safety (Refs & Annos)
        Subpart IV. Enforcement and Penalties (Refs & Annos)
          Chapter 461. Investigations and Proceedings

49 U.S.C.A. § 46110

§ 46110. Judicial review

Effective: October 5, 2018

Currentness

**(a) Filing and venue.**--Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

**(b) Judicial procedures.**--When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, as appropriate. The Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

**(c) Authority of court.**--When the petition is sent to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration to conduct further proceedings. After reasonable notice to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, if supported by substantial evidence, are conclusive.

**(d) Requirement for prior objection.**--In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation

Administration only if the objection was made in the proceeding conducted by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration or if there was a reasonable ground for not making the objection in the proceeding.

**(e) Supreme Court review.**--A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

### CREDIT(S)

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1230; Pub.L. 107-71, Title I, § 140(b)(1), (2), Nov. 19, 2001, 115 Stat. 641; Pub.L. 108-176, Title II, § 228, Dec. 12, 2003, 117 Stat. 2532; Pub.L. 115-254, Div. K, Title I, § 1991(f)(1) to (4), Oct. 5, 2018, 132 Stat. 3642.)

49 U.S.C.A. § 46110, 49 USCA § 46110
Current through P.L. 117-159. Some statute sections may be more current, see credits for details.

　　　　　© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 14. Aeronautics and Space
Chapter I. Federal Aviation Administration, Department of Transportation
Subchapter E. Airspace
Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)
Subpart C. Standards for Determining Obstructions to Air Navigation or Navigational AIDS or Facilities

14 C.F.R. § 77.17

§ 77.17 Obstruction standards.

Effective: January 18, 2011

Currentness

(a) An existing object, including a mobile object, is, and a future object would be an obstruction to air navigation if it is of greater height than any of the following heights or surfaces:

(1) A height of 499 feet AGL at the site of the object.

(2) A height that is 200 feet AGL, or above the established airport elevation, whichever is higher, within 3 nautical miles of the established reference point of an airport, excluding heliports, with its longest runway more than 3,200 feet in actual length, and that height increases in the proportion of 100 feet for each additional nautical mile from the airport up to a maximum of 499 feet.

(3) A height within a terminal obstacle clearance area, including an initial approach segment, a departure area, and a circling approach area, which would result in the vertical distance between any point on the object and an established minimum instrument flight altitude within that area or segment to be less than the required obstacle clearance.

(4) A height within an en route obstacle clearance area, including turn and termination areas, of a Federal Airway or approved off-airway route, that would increase the minimum obstacle clearance altitude.

(5) The surface of a takeoff and landing area of an airport or any imaginary surface established under § 77.19, 77.21, or 77.23. However, no part of the takeoff or landing area itself will be considered an obstruction.

(b) Except for traverse ways on or near an airport with an operative ground traffic control service furnished by an airport traffic control tower or by the airport management and coordinated with the air traffic control service, the standards of paragraph (a) of this section apply to traverse ways used or to be used for the passage of mobile objects only after the heights of these traverse ways are increased by:

(1) 17 feet for an Interstate Highway that is part of the National System of Military and Interstate Highways where overcrossings are designed for a minimum of 17 feet vertical distance.

Addendum 15

(2) 15 feet for any other public roadway.

(3) 10 feet or the height of the highest mobile object that would normally traverse the road, whichever is greater, for a private road.

(4) 23 feet for a railroad.

(5) For a waterway or any other traverse way not previously mentioned, an amount equal to the height of the highest mobile object that would normally traverse it.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

**End of Document**                                                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 14. Aeronautics and Space
    Chapter I. Federal Aviation Administration, Department of Transportation
      Subchapter E. Airspace
        Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)
          Subpart D. Aeronautical Studies and Determinations

14 C.F.R. § 77.29

§ 77.29 Evaluating aeronautical effect.

Effective: January 18, 2011

Currentness

(a) The FAA conducts an aeronautical study to determine the impact of a proposed structure, an existing structure that has not yet been studied by the FAA, or an alteration of an existing structure on aeronautical operations, procedures, and the safety of flight. These studies include evaluating:

(1) The impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules;

(2) The impact on arrival, departure, and en route procedures for aircraft operating under instrument flight rules;

(3) The impact on existing and planned public use airports;

(4) Airport traffic capacity of existing public use airports and public use airport development plans received before the issuance of the final determination;

(5) Minimum obstacle clearance altitudes, minimum instrument flight rules altitudes, approved or planned instrument approach procedures, and departure procedures;

(6) The potential effect on ATC radar, direction finders, ATC tower line-of-sight visibility, and physical or electromagnetic effects on air navigation, communication facilities, and other surveillance systems;

(7) The aeronautical effects resulting from the cumulative impact of a proposed construction or alteration of a structure when combined with the effects of other existing or proposed structures.

(b) If you withdraw the proposed construction or alteration or revise it so that it is no longer identified as an obstruction, or if no further aeronautical study is necessary, the FAA may terminate the study.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

Addendum 17

§ 77.29 Evaluating aeronautical effect., 14 C.F.R. § 77.29

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 14. Aeronautics and Space
    Chapter I. Federal Aviation Administration, Department of Transportation
      Subchapter E. Airspace
        Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)
          Subpart D. Aeronautical Studies and Determinations

14 C.F.R. § 77.31

§ 77.31 Determinations.

Effective: January 18, 2011
Currentness

(a) The FAA will issue a determination stating whether the proposed construction or alteration would be a hazard to air navigation, and will advise all known interested persons.

(b) The FAA will make determinations based on the aeronautical study findings and will identify the following:

(1) The effects on VFR/IFR aeronautical departure/arrival operations, air traffic procedures, minimum flight altitudes, and existing, planned, or proposed airports listed in § 77.15(e) of which the FAA has received actual notice prior to issuance of a final determination.

(2) The extent of the physical and/or electromagnetic effect on the operation of existing or proposed air navigation facilities, communication aids, or surveillance systems.

(c) The FAA will issue a Determination of Hazard to Air Navigation when the aeronautical study concludes that the proposed construction or alteration will exceed an obstruction standard and would have a substantial aeronautical impact.

(d) A Determination of No Hazard to Air Navigation will be issued when the aeronautical study concludes that the proposed construction or alteration will exceed an obstruction standard but would not have a substantial aeronautical impact to air navigation. A Determination of No Hazard to Air Navigation may include the following:

(1) Conditional provisions of a determination.

(2) Limitations necessary to minimize potential problems, such as the use of temporary construction equipment.

(3) Supplemental notice requirements, when required.

(4) Marking and lighting recommendations, as appropriate.

(e) The FAA will issue a Determination of No Hazard to Air Navigation when a proposed structure does not exceed any of the obstruction standards and would not be a hazard to air navigation.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 20

§ 77.35 Extensions, terminations, revisions and corrections., 14 C.F.R. § 77.35

---

Code of Federal Regulations
   Title 14. Aeronautics and Space
      Chapter I. Federal Aviation Administration, Department of Transportation
         Subchapter E. Airspace
         Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)
            Subpart D. Aeronautical Studies and Determinations

14 C.F.R. § 77.35

§ 77.35 Extensions, terminations, revisions and corrections.

Effective: January 18, 2011

Currentness

(a) You may petition the FAA official that issued the Determination of No Hazard to Air Navigation to revise or reconsider the determination based on new facts or to extend the effective period of the determination, provided that:

(1) Actual structural work of the proposed construction or alteration, such as the laying of a foundation, but not including excavation, has not been started; and

(2) The petition is submitted at least 15 days before the expiration date of the Determination of No Hazard to Air Navigation.

(b) A Determination of No Hazard to Air Navigation issued for those construction or alteration proposals not requiring an FCC construction permit may be extended by the FAA one time for a period not to exceed 18 months.

(c) A Determination of No Hazard to Air Navigation issued for a proposal requiring an FCC construction permit may be granted extensions for up to 18 months, provided that:

(1) You submit evidence that an application for a construction permit/license was filed with the FCC for the associated site within 6 months of issuance of the determination; and

(2) You submit evidence that additional time is warranted because of FCC requirements; and

(3) Where the FCC issues a construction permit, a final Determination of No Hazard to Air Navigation is effective until the date prescribed by the FCC for completion of the construction. If an extension of the original FCC completion date is needed, an extension of the FAA determination must be requested from the Obstruction Evaluation Service (OES).

(4) If the Commission refuses to issue a construction permit, the final determination expires on the date of its refusal.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

---

§ 77.35 Extensions, terminations, revisions and corrections., 14 C.F.R. § 77.35

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
   Title 14. Aeronautics and Space
      Chapter I. Federal Aviation Administration, Department of Transportation
      Subchapter E. Airspace
         Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)
         Subpart E. Petitions for Discretionary Review

---

14 C.F.R. § 77.37

§ 77.37 General.

Effective: January 18, 2011

Currentness

(a) If you are the sponsor, provided a substantive aeronautical comment on a proposal in an aeronautical study, or have a substantive aeronautical comment on the proposal but were not given an opportunity to state it, you may petition the FAA for a discretionary review of a determination, revision, or extension of a determination issued by the FAA.

(b) You may not file a petition for discretionary review for a Determination of No Hazard that is issued for a temporary structure, marking and lighting recommendation, or when a proposed structure or alteration does not exceed obstruction standards contained in subpart C of this part.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

---

**End of Document**                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

§ 77.39 Contents of a petition., 14 C.F.R. § 77.39

Code of Federal Regulations
   Title 14. Aeronautics and Space
      Chapter I. Federal Aviation Administration, Department of Transportation
      Subchapter E. Airspace
         Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)
         Subpart E. Petitions for Discretionary Review

14 C.F.R. § 77.39

§ 77.39 Contents of a petition.

Effective: January 18, 2011

Currentness

(a) You must file a petition for discretionary review in writing and it must be received by the FAA within 30 days after the issuance of a determination under § 77.31, or a revision or extension of the determination under § 77.35.

(b) The petition must contain a full statement of the aeronautical basis on which the petition is made, and must include new information or facts not previously considered or presented during the aeronautical study, including valid aeronautical reasons why the determination, revisions, or extension made by the FAA should be reviewed.

(c) In the event that the last day of the 30–day filing period falls on a weekend or a day the Federal government is closed, the last day of the filing period is the next day that the government is open.

(d) The FAA will inform the petitioner or sponsor (if other than the petitioner) and the FCC (whenever an FCC–related proposal is involved) of the filing of the petition and that the determination is not final pending disposition of the petition.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

**End of Document**            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Addendum 24

---

Code of Federal Regulations

    Title 14. Aeronautics and Space

        Chapter I. Federal Aviation Administration, Department of Transportation

        Subchapter E. Airspace

            Part 77. Safe, Efficient Use, and Preservation of the Navigable Airspace (Refs & Annos)

            Subpart E. Petitions for Discretionary Review

---

14 C.F.R. § 77.41

§ 77.41 Discretionary review results.

Effective: January 18, 2011

Currentness

(a) If discretionary review is granted, the FAA will inform the petitioner and the sponsor (if other than the petitioner) of the issues to be studied and reviewed. The review may include a request for comments and a review of all records from the initial aeronautical study.

(b) If discretionary review is denied, the FAA will notify the petitioner and the sponsor (if other than the petitioner), and the FCC, whenever a FCC–related proposal is involved, of the basis for the denial along with a statement that the determination is final.

(c) After concluding the discretionary review process, the FAA will revise, affirm, or reverse the determination.

SOURCE: Amdt. 77–13, 75 FR 42303, July 21, 2010; 76 FR 8628, Feb. 15, 2011, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106 (g), 40103, 40113–40114, 44502, 44701, 44718, 46101–46102, 46104.

Current through July 12, 2022, 87 FR 41262. Some sections may be more current. See credits for details.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---



**U.S. DEPARTMENT OF TRANSPORTATION**
FEDERAL AVIATION ADMINISTRATION
Air Traffic Organization Policy

**ORDER
JO 7400.2N**

Effective Date:
June 17, 2021

**SUBJ:**    Procedures for Handling Airspace Matters

This order specifies procedures for use by all personnel in the joint administration of the airspace program. The guidance and procedures herein incorporate into one publication as many orders, notices, and directives of the affected services as possible. Although every effort has been made to prescribe complete procedures for the management of the different airspace programs, it is impossible to cover every circumstance. Therefore, when a situation arises for which there is no specific procedure covered in this order, personnel must exercise their best judgment.

The order consists of six parts:

**a.**  Part 1 addresses general procedures applicable to airspace management.

**b.**  Part 2 addresses policy and procedures unique to Objects Affecting Navigable Airspace.

**c.**  Part 3 addresses policy and procedures unique to Airport Airspace Analysis.

**d.**  Part 4 addresses policy and procedures unique to Terminal and En Route Airspace.

**e.**  Part 5 addresses policy and procedures unique to Special Use Airspace.

**f.**  Part 6 addresses policy and procedures regarding the integration of Outdoor Laser Operations, High Intensity Light Operations, and integration of Rocket and Launch-Vehicle Operations into the National Airspace System.

Natasha A.
Durkins

Digitally signed by
Natasha A. Durkins
Date: 2021.05.13
07:33:04 -04'00'

Natasha A. Durkins
Director, Policy, AJV-P
Air Traffic Organization

Case: 21-71426, 07/13/2022, ID: 12493427, DktEntry: 19, Page 82 of 103

# Part 1.  General Procedures for Airspace Management

# Chapter 1.  General

## Section 1.  Introduction

### 1–1–1. PURPOSE OF THIS ORDER

**a.** This order prescribes policy, criteria, guidelines, and procedures applicable to the System Operations Services; Mission Support Services; Aeronautical Information Services; Technical Operations Services; Technical Operations Spectrum Engineering Services Group/Spectrum Assignment and Engineering Team; Technical Operations Technical Services; the Office of Airport Planning and Programming, (APP); the Office of Airport Safety and Standards, (AAS); Airports District Office (ADO); and the Flight Standards Service.

**b.** While this order provides procedures for handling airspace matters, additional procedures and criteria to supplement those contained herein may be set forth in other directives and should be consulted.

### 1–1–2. AUDIENCE

**a.** This order applies to all ATO personnel and anyone using ATO directives.

**b.** This order also applies to all regional, Service Centers, Instrument Flight Procedure (IFP) Service Providers, and field organizational elements involved in rulemaking and nonrulemaking actions associated with airspace allocation and utilization, obstruction evaluation, obstruction marking and lighting, airport airspace analysis, and the management of air navigation aids. States that participate in the State Block Grant Program (SBGP) assist the Office of Airport Safety and Standards in these actions, but the overall responsibility remains with the Office of Airports. Participating states include Georgia, Illinois, Michigan, Missouri, New Hampshire, North Carolina, Pennsylvania, Tennessee, Texas, and Wisconsin.

### 1–1–3. WHERE TO FIND THIS ORDER

This order is available on the FAA website at http://www.faa.gov/air_traffic/publications and http://employees.faa.gov/tools_resources/orders_notices.

### 1–1–4. WHAT THIS ORDER CANCELS

FAA Order JO 7400.2M, Procedures for Handling Airspace Matters, dated February 28, 2019, and all changes to it are canceled.

### 1–1–5. CHANGE AUTHORITY

The Director of Policy (AJV–P) will issue changes to this directive after obtaining concurrence from the affected Headquarters offices/services/service units on the cover of this order.

### 1–1–6. EXPLANATION OF CHANGES

**a.** The significant changes to this order are identified in the Explanation of Changes page(s). It is advisable to retain the page(s) throughout the duration of the basic order.

**b.** If further information is desired, please direct questions through the appropriate facility/service area/regional office to the headquarters office of primary responsibility.

### 1–1–7. SUBMISSION CUTOFF AND EFFECTIVE DATES

This order and its changes are scheduled to be published to coincide with AIRAC dates. However, due to the infrequent nature of changes submitted for this order, publishing may be postponed.

| Publication Schedule | | |
|---|---|---|
| **Basic or Change** | **Cutoff Date for Submission** | **Effective Date of Publication** |
| JO 7400.2N | 12/31/20 | 6/17/21 |
| Change 1 | 6/17/21 | 12/2/21 |
| Change 2 | 12/2/21 | 5/19/22 |
| Change 3 | 5/19/22 | 11/3/22 |

# Section 3. Identifying/Evaluating Aeronautical Effect

## 6–3–1. POLICY

**a.** The prime objective of the FAA in conducting OE studies is to ensure the safety of air navigation, and the efficient utilization of navigable airspace by aircraft. There are many demands being placed on the use of the navigable airspace. However, when conflicts arise concerning a structure being studied, the FAA emphasizes the need for conserving the navigable airspace for aircraft; preserving the integrity of the national airspace system; and protecting air navigation facilities from either electromagnetic or physical encroachments that would preclude normal operation.

**b.** In the case of such a conflicting demand for the airspace by a proposed construction or alteration, the first consideration should be given to altering the proposal.

**c.** In the case of an existing structure, first consideration should be given to adjusting the aviation procedures to accommodate the structure. This does not preclude issuing a "Determination Of Hazard To Air Navigation" on an existing structure when the needed adjustment of aviation procedures could not be accomplished without a substantial adverse effect on aeronautical operations. In all cases, consideration should be given to all known plans on file received by the end of the public comment period or before issuance of a determination if the case was not circularized.

## 6–3–2. SCOPE

Part 77 establishes standards for determining obstructions to air navigation. A structure that exceeds one or more of these standards is presumed to be a hazard to air navigation unless the aeronautical study determines otherwise. An obstruction evaluation must identify:

**a.** The effect the structure would have:

**1.** On existing and proposed public–use, private use with at least one FAA–approved instrument approach procedure, and DOD airports and/or aeronautical facilities.

**2.** On existing and proposed visual flight rule (VFR)/instrument flight rule (IFR) aeronautical

departure, arrival and en route operations, procedures, and minimum flight altitudes.

**3.** Regarding physical, electromagnetic, or line–of–sight interference on existing or proposed air navigation, communications, radar, and control systems facilities.

**4.** On airport capacity, as well as the cumulative impact resulting from the structure when combined with the impact of other existing or proposed structures.

**b.** Whether marking and/or lighting is necessary.

## 6–3–3. DETERMINING ADVERSE EFFECT

If a structure first exceeds the obstruction standards of Part 77, and/or is found to have physical or electromagnetic radiation effect on the operation of air navigation facilities, then the proposed or existing structure, if not amended, altered, or removed, has an adverse effect if it would:

**a.** Require a change to an existing or planned IFR minimum flight altitude, a published or special instrument procedure, or an IFR departure procedure.

**b.** Require a VFR operation, to change its regular flight course or altitude. This does not apply to VFR military training route (VR) operations conducted under Part 137, or operations conducted under a waiver or exemption to the CFR.

**c.** Restrict the clear view of runways, helipads, taxiways, or traffic patterns from the airport traffic control tower cab.

**d.** Derogate airport capacity/efficiency.

**e.** Affect future VFR and/or IFR operations as indicated by plans on file.

**f.** Affect the usable length of an existing or planned runway.

## 6–3–4. DETERMINING SIGNIFICANT VOLUME OF ACTIVITY

The type of activity must be considered in reaching a decision on the question of what volume of aeronautical activity is "significant." For example, if one or more aeronautical operations per day would be affected, this would indicate regular and continuing

activity, thus a significant volume no matter what the type of operation. However, an affected instrument procedure or minimum altitude may need to be used only an average of once a week to be considered significant if the procedure is one which serves as the primary procedure under certain conditions.

## 6–3–5. SUBSTANTIAL ADVERSE EFFECT

A proposed structure would have, or an existing structure has, a substantial adverse effect if it causes electromagnetic interference to the operation of an air navigation facility or the signal used by aircraft, or if there is a combination of:

**a.** Adverse effect as described in paragraph 6–3–3; and

**b.** A significant volume of aeronautical operations, as described in paragraph 6–3–4, would be affected.

## 6–3–6. RESPONSIBILITY

The FAA's obstruction evaluation program transcends organizational lines. In order to determine the effect of the structure within the required notice period, each office should forward the results of its evaluation within 15 working days to the Obstruction Evaluation Group (OEG) for further processing. In cases of evaluating the effects of a proposed wind turbine farm, see Appendix 12 for field air traffic control facility responsibility and procedures. Areas of responsibility are delegated as follows:

**a.** OEG personnel must:

**1.** Identify when the structure exceeds Section 77.17 (a)(1), (a)(2), and (a)(5) (see FIG 6−3−1 thru FIG 6−3−6) and apply Section 77.17 (b) (see FIG 5−2−4).

**2.** Identify the effect on existing and planned aeronautical operations, air traffic control procedures, and airport traffic patterns and making recommendations for mitigating adverse effect including marking and lighting recommendations.

**3.** Identify when the structure would adversely affect published helicopter route operations as specified in paragraph 6–3–8 subparagraph e, of this order, and forward the case to Flight Standards.

**4.** Identify whether obstruction marking/lighting are necessary and recommend the appropriate marking and/or lighting.

**5.** Identify when negotiations are necessary and conduct negotiations with the sponsor. This may be done in conjunction with assistance from other division/service area office personnel when their subject expertise is required (for example, in cases of electromagnetic interference).

**6.** Identify when circularization is necessary and conduct the required circularization process.

**7.** Evaluate all valid aeronautical comments received as a result of the circularization and those received as a result of the division evaluation.

**8.** Issue the determination (except as noted in paragraph 7–1–2, subparagraph b).

**b.** Regional Airports Division personnel must:

**1.** Verify that the airport/runway database has been reviewed, is correct, and contains all plans on file pertaining to the OE case.

**2.** Identify the structure's effect on existing and planned airports or improvements to airports concerning airport design criteria including potential restrictions/impacts on airport operations, capacity, efficiency and development, and making recommendations for eliminating adverse effect. Airports Divisions are not normally required to perform evaluations on OE cases that are beyond the lateral limits of the Part 77 conical surface of a public−use or military airport.

**3.** Determine the effect on the efficient use of airports and the safety of persons and property on the ground. Airports will resist structures and activities that conflict with an airport's planning and/or design.

**4.** State what mitigations may be made to mitigate or eliminate any adverse effect of the structure on existing or planned airports.

**c.** IFP Service Providers must:

**1.** Identify when the structure exceeds Section 77.17(a)(3).

**2.** Identify the effect upon terminal area IFR operations, including transitions; holding; instrument departure procedures; any segment of a Standard Instrument Approach Procedure (SIAP) or Special Instrument Approach Procedure (IAP), including proposed instrument procedures and departure areas.

**3.** State what adjustments can be made to the procedure/structure to mitigate or eliminate any adverse effects of the structure on an instrument flight procedure. Include a "no effect height" and/or survey accuracy that, if negotiated, would mitigate or eliminate adverse effect on an instrument flight procedure.

**d.** IFP Service Providers. In addition to 6-3-6c, the IFP Service Providers must:

**1.** Identify when the structure exceeds Section 77.17(a)(4).

**2.** Identify the effect on any IFR procedure which may include, but is not limited to: minimum en route altitudes (MEA); minimum obstruction clearance altitudes (MOCA); minimum IFR altitudes (MIA); minimum safe altitudes (MSA); minimum crossing altitudes (MCA); minimum holding altitudes (MHA); turning areas and termination areas; and making recommendations for eliminating adverse effect.

**e.** Aeronautical Information Services' Obstacle Impact Team (OIT). In addition to 6-3-6c and d, the IFP OIT must identify the effect on any IFR procedure which may include minimum vectoring altitudes (MVA).

**f.** Flight Technologies and Procedures Division (FTPD) personnel must identify the effect on fixed-wing and helicopter VFR routes, terminal operations, and other concentrations of VFR traffic. When requested by OEG, FTPD must also evaluate the mitigation of adverse effect on VFR operations for marking and/or lighting of structures.

**g.** Technical Operations Services personnel must identify any electromagnetic and/or physical effect on air navigation and communications facilities including:

**1.** The presence of any electromagnetic effect in the frequency protected service volume of the facilities shown in FIG 6-3-16, FIG 6-3-17, and FIG 6-3-18.

**2.** The effect on the availability or quality of navigational or communications signals to or from aircraft including lighting systems (for example, VGSI), and making recommendations to eliminate adverse effect.

**3.** The effect on ground-based communications and NAVAID equipment, and the signal paths between ground-based and airborne equipment, and making recommendations to eliminate adverse effect.

**4.** The effect on the availability or quality of ground-based primary and secondary radar; direction finders; and air traffic control tower line-of-sight visibility; and making recommendations to eliminate adverse effect.

**5.** The effect of sunlight or artificial light reflections, and making recommendations to eliminate adverse effect.

**h.** Military personnel are responsible for evaluating the effect on airspace and routes used by the military.

**i.** Other applicable FAA offices or services may be requested to provide an evaluation of the structure on a case-by-case basis.

## 6–3–7. AIRPORT SURFACES AND CLEARANCE AREAS

**a.** CIVIL AIRPORT SURFACES

**1.** Civil airport imaginary surfaces are defined in Section 77.19 and are based on the category of each runway according to the type of approach (visual, nonprecision, or precision) available or planned for each runway end (see FIG 6–3–7). The appropriate runway imaginary surface must be applied to the primary surfaces related to the physical end of the specific runway surface that is usable for either takeoff or landing.

**2.** Approach Surface Elevation – Use the runway centerline elevation at the runway threshold and the elevation of the helipad as the elevation from which the approach surface begins (see Sections 77.19 and 77.23).

**3.** Heliport imaginary surfaces are defined in Section 77.23 and are based upon the size of the takeoff and landing area.

**4.** Planned Airport/Runway Improvements – Consider the planned runway threshold and approach type when there is a plan on file with the FAA or with an appropriate military service to extend the runway and/or upgrade its use or type of approach. The existing runway threshold and type of approach may be used for temporary structures/equipment, as appropriate.

**b.** DOD AIRPORT SURFACES – The obstruction standards in Section 77.19, Civil Airport Imaginary Surfaces, apply to civil operated joint–use airports. The obstruction standards in Section 77.21, DOD Airport Imaginary Surfaces, are applicable only to airports operated and controlled by a DOD service of the United States, regardless of whether use by civil aircraft is permitted.

**c.** TERMINAL OBSTACLE CLEARANCE AREA – The terminal obstacle clearance area specified in Section 77.17(a)(3) includes the initial, intermediate, final, and missed approach segments of an instrument approach procedure, and the circling approach and instrument departure areas. The applicable FAA approach and departure design criteria are contained in the 8260.3 Order series.

**d.** EN ROUTE OBSTACLE CLEARANCE AREA – The en route obstacle clearance area specified in Section 77.17(a)(4) is applicable when evaluating the effect of a structure on an airway, a feeder route, and/or an approved off–airway route (direct route) as prescribed in the 8260.3 Order series.

## 6–3–8. EVALUATING EFFECT ON VFR OPERATIONS

**a.** PURPOSE. These guidelines are for use in determining the effect of structures, whether proposed or existing, upon VFR aeronautical operations in the navigable airspace. The intent of these guidelines is to provide a basis for analytical judgments in evaluating the effect of structures on VFR operations.

**b.** CONSIDERATIONS

**1.** Minimum VFR Flight Altitudes. Minimum VFR flight altitudes are prescribed by regulation. Generally speaking, from a VFR standpoint, the navigable airspace includes all airspace 500 feet AGL or greater and that airspace below 500 feet required for:

**(a)** Takeoff and landing, including the airport traffic pattern.

**(b)** Flight over open water and sparsely populated areas (an aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure).

**(c)** Helicopter operations when the operation may be conducted without hazard to persons and property on the surface.

**2.** VFR Weather Minimums. Proposed or existing structures potentially have the greatest impact in those areas where VFR operations are conducted when ceiling and/or visibility conditions are at or near VFR weather minimums. Any structure that would interfere with a significant volume of low altitude flights by actually excluding or restricting VFR operations in a specific area would have a substantial adverse effect and may be considered a hazard to air navigation.

**3.** Marking and/or Lighting of Structures. Not every structure penetrating the navigable airspace is considered to be a hazard to air navigation. Some may be marked and/or lighted so pilots can visually observe and avoid the structures.

**4.** Shielded Structures. A structure may be "shielded" by being located in proximity to other permanent structures or terrain and would not, by

itself, adversely affect aeronautical operations (see paragraph 6–3–13).

**5.** Height Of Structures. Structures are of concern to pilots during a climb after takeoff, low altitude operations, and when descending to land. Any structure greater than 500 feet AGL, or structures of any height which would affect landing and takeoff operations, requires extensive evaluation to determine the extent of adverse effect on VFR aeronautical operations.

**6.** Airport Traffic Patterns. The primary concern regarding structures in airport traffic pattern areas is whether they would create a dangerous situation during a critical phase of flight.

**7.** Class B and C Airspace. Structures that exceed obstruction standards in areas available for VFR flight below the floor of Class B or C airspace areas require careful evaluation. Class B and C airspace areas are designed to provide a more regulated environment for IFR and VFR traffic in and around certain airports. Consequently, the floors of some Class B and C areas compress VFR operations into airspace of limited size and minimum altitude availability.

**8.** VFR Routes. Pilots operating VFR frequently fly routes that follow rivers, coastlines, mountain passes, valleys, and similar types of natural landmarks or major highways, railroads, powerlines, canals, and other manmade structures. A VFR route may also be comprised of specific radials of a Very High Frequency Omnidirectional Range (VOR). These routes may correspond to an established Federal Airway, direct radials between navigation facilities, or a single radial providing transition to a route predicated on visual aids. While there may be established minimum en route altitudes for segments of these routes and navigation is dependent upon adequate signal reception, a VFR pilot may fly at an altitude below the established minimum altitude in order to maintain visual contact with the ground. The basic consideration in evaluating the effect of obstructions on operations along these routes is whether pilots would be able to visually observe and avoid them during marginal VFR weather conditions. At least 1–mile flight visibility is required for VFR operations beneath the floor of controlled airspace. This means that a surface reference used for VFR low altitude flight must be horizontally visible to pilots for a minimum of 1 mile.

**c.** EN ROUTE OPERATIONS. The area considered for en route VFR flight begins and ends outside the airport traffic pattern airspace area or Class B, C, and D airspace areas.

**1.** A structure would have an adverse effect upon VFR air navigation if its height is greater than 499 feet above the surface at its site, and within 2 statute miles of any regularly used VFR route (see FIG 6–3–8).

**2.** Evaluation of obstructions located within VFR routes must recognize that pilots may, and sometimes do, operate below the floor of controlled airspace during low ceilings and 1–mile flight visibility. When operating in these weather conditions and using pilotage navigation, these flights must remain within 1 mile of the identifiable landmark to maintain visual reference. Even if made more conspicuous by the installation of high intensity white obstruction lights, a structure placed in this location could be a hazard to air navigation because after sighting it, the pilot may not have the opportunity to safely circumnavigate or overfly the structure.

**3.** VFR DOD TRAINING ROUTES (VR) – Operations on VRs provide DOD aircrews low altitude, high speed navigation and tactics training, and are a basic requirement for combat readiness (see FAA Order JO 7610.4, Special Operations). Surface structures have their greatest impact on VFR operations when ceiling and visibility conditions are at or near basic VFR minimums. Accordingly, the guidelines for a finding of substantial adverse effect on en route VFR operations are based on consideration for those operations conducted under Part 91 that permits flight clear of clouds with 1 mile flight visibility outside controlled airspace. In contrast, flight along VRs can be conducted only when weather conditions equal or exceed 3,000 feet ceiling and 5 miles visibility. A proposed structure's location on a VR is not a basis for determining it to be a hazard to air navigation; however, in recognition of the DOD's requirement to conduct low altitude training, disseminate Part 77 notices and aeronautical study information to DOD representatives. Additionally, attempt to persuade the sponsor to lower or relocate a proposed structure that exceeds obstruction standards and has been identified by the DOD as detrimental to its training requirement.

**d.** AIRPORT AREAS − Consider the following when determining the effect of structures on VFR operations near airports:

**1.** Traffic Pattern Airspace − There are many variables that influence the establishment of airport arrival and departure traffic flows. Structures in the traffic pattern airspace may adversely affect air navigation by being a physical obstruction to air navigation or by distracting a pilot's attention during a critical phase of flight. The categories of aircraft using the airport determine airport traffic pattern airspace dimensions.

**(a)** Traffic Pattern Airspace dimensions (See FIG 6−3−9).

**(b)** Within Traffic Pattern Airspace − A structure that exceeds a 14 CFR, Part 77 obstruction standard and that exceeds any of the following heights is considered to have an adverse effect and would have a substantial adverse effect if a significant volume of VFR aeronautical operations are affected except as noted in paragraph 6−3−8 d.1.(f) and (g) (see FIG 6−3−10).

**(c)** The height of the transition surface (other than abeam the runway), the approach slope (up to the height of the horizontal surface), the horizontal surface, and the conical surface (as applied to visual approach runways, Section 77.19).

**(d)** Beyond the lateral limits of the conical surface and in the climb/descent area − 350 feet above airport elevation or the height of 14 CFR Section 77.17(a)(2), whichever is greater not to exceed 499 feet above ground level (AGL). The climb/descent area begins abeam the runway threshold being used and is the area where the pilot is either descending to land on the runway or climbing to pattern altitude after departure. (The area extending outward from a line perpendicular to the runway at the threshold, see FIG 6−3−11).

**(e)** Beyond the lateral limits of the conical surface and not in the climb/descent area of any runway − 499 feet above airport elevation (AE) not to exceed 499 feet AGL.

**(f)** An existing structure (that has been previously studied by the FAA), terrain, or a proposed structure (that would be shielded by existing structures) may not be considered to have a substantial adverse effect. In such instances, the traffic pattern may be adjusted as needed on a case−by−case basis.

**(g)** Exceptions may be made on a case−by−case basis when the surrounding terrain is significantly higher than the airport elevation, the established traffic pattern altitude is less than 800 feet above airport elevation or "density altitude" is a consideration.

**2.** Terminal Transition Routes − A structure would have an adverse effect upon VFR air navigation if it:

**(a)** Exceeds a height of 499 feet above the surface at its site; and

**(b)** Is located within 2 statute miles of the centerline of any regularly used VFR route (see FIG 6−3−8).

**3.** VFR Approach Surface Slope Ratios − A structure would have an adverse effect upon VFR air navigation if it penetrates the approach surface slope of any runway. The following slope ratios are applied to the end of the primary surface:

**(a)** 20:1 for civil visual approaches.

**(b)** 50:1 for DOD runway approaches.

**(c)** 8:1 for civil helicopter approaches surfaces.

**(d)** 10:1 for DOD helicopter approach surfaces.

**e.** HELICOPTERS – The special maneuvering characteristics of helicopters are recognized in Sections 91.119 and 91.155, provided operations are conducted without hazard to persons or property on the ground. Helicopter pilots must also operate at a speed that will allow them to see and avoid obstructions. Consequently, proposed or existing structures are not considered factors in determining adverse effect upon helicopter VFR operations except as follows:

**1.** En route. When the Administrator prescribes routes and altitudes for helicopters, the exemptions to Part 91 for helicopters do not apply. Thus, any structure would have an adverse effect if it penetrates an imaginary surface 300 feet below an established helicopter minimum flight altitude and is located within 250 feet either side of the established route's centerline.

**2.** Heliport Landing/Takeoff Area. Any structure would have an adverse effect if it would exceed any of the heliport imaginary surfaces. Although helicopter approach–departure paths may curve, the length of the approach–departure surface remains fixed.

**f.** AGRICULTURAL AND INSPECTION AIRCRAFT OPERATIONS – Rules that apply to agricultural dispensing operations, as prescribed in Part 137, allow deviation from Part 91 altitude restrictions. It is the pilot's responsibility to avoid obstacles because the agricultural operations must be conducted without creating a hazard to persons or property on the surface. Similar operations include pipeline, power line, and military low–level route inspections. Consequently, these operations are not considered in reaching a determination of substantial adverse effect.

*NOTE–*
*Before and after the dispensing is completed, the pilot is required to operate under the Part 91 minimum altitudes.*

**g.** OPERATIONS UNDER WAIVER OR EXEMPTION TO CFR – Waivers and/or exemptions to CFR operating rules include provisions to ensure achievement of a level of safety equivalent to that which would be present when complying with the regulation waived or exempted. Additionally, waivers and exemptions do not relieve pilots of their responsibility to conduct operations without creating a hazard to persons and property on the surface. Accordingly, a determination of hazard to air navigation must not be based upon a structure's effect on aeronautical operations conducted under a waiver or exemption to CFR operating rules.

## 6–3–9. EVALUATING EFFECT ON IFR OPERATIONS

**a.** PURPOSE. This section provides general guidelines for determining the effect of structures, whether proposed or existing, upon IFR aeronautical operations.

**b.** STANDARDS. Obstruction standards are used to identify potential adverse effects and are not the basis for a determination. The criteria used in determining the extent of adverse affect are those established by the FAA to satisfy operational, procedural, and electromagnetic requirements. These criteria are contained in regulations, advisory circulars, and orders (for example, the 8260 Order series and FAA Order JO 7110.65). Obstruction evaluation personnel must apply these criteria in evaluating the extent of adverse effect to determine if the structure being studied would actually have a substantial adverse effect and would constitute a hazard to air navigation.

**c.** IFR MINIMUM FLIGHT ALTITUDES. Technical Operations Aviation System Standards is the principal FAA element responsible for establishing instrument procedures and minimum altitudes for IFR operations. FPT personnel must evaluate the effect of proposed structures on IFR aeronautical operations as outlined in Order 8260.19, Flight Procedures and Airspace.

**d.** EN ROUTE IFR OPERATIONS

**1.** Minimum En Route Altitudes (MEA). MEAs are established for each segment of an airway or an approved route based upon obstacle clearance, navigational signal reception, and communications. The MEA assures obstruction clearance and acceptable navigational signal coverage over the entire airway or route segment flown. Any structure that will require an MEA to be raised has an adverse effect. Careful analysis by the appropriate IFP Service Provider and air traffic personnel is necessary to determine if there would be a substantial adverse effect on the navigable airspace. Generally, the loss of a cardinal altitude is considered a substantial adverse effect. However, the effect may not be substantial if the aeronautical study discloses that the

Addendum 34

affected MEA is not normally flown by aircraft, nor used for air traffic control purposes

**2.** Minimum Obstruction Clearance Altitudes (MOCA). MOCAs assure obstacle clearance over the entire route segment to which they apply and assure navigational signal coverage within 22 NM of the associated VOR navigational facility. For that portion of the route segment beyond 22 NM from the VOR, where the MOCA is lower than the MEA and there are no plans to lower the MEA to the MOCA, a structure that affects only the MOCA would not be considered to have substantial adverse effect. Other situations require study as ATC may assign altitudes down to the MOCA under certain conditions.

**3.** Minimum IFR Altitudes (MIA). These altitudes are established in accordance with Order 7210.37, En Route Minimum IFR Altitude Sector Charts, to provide the controller with minimum IFR altitude information for off−airway operations. MIAs provide the minimum obstacle clearance and are established without respect to flight−checked radar or normal radar coverage. Any structure that would cause an increase in a MIA is an obstruction, and further study is required to determine the extent of adverse effect. Radar coverage adequate to vector around such a structure is not, of itself, sufficient to mitigate a finding of substantial adverse effect that would otherwise be the basis for a determination of hazard to air navigation.

**4.** IFR Military Training Routes (IRs) − Operations on IR's provide pilots with training for low altitude navigation and tactics (see FAA Order JO 7610.4, Special Operations). Flight along these routes can be conducted below the minimum IFR altitude specified in Part 91, and the military conducts operational flight evaluations of each route to ensure compatibility with their obstructions clearance requirements. A proposed structure's location on an IR is not a basis for determining it to be a hazard to air navigation; however, in recognition of the military's requirement to conduct low altitude training, disseminate Part 77 notices and aeronautical study information to military representatives. Additionally, attempt to persuade the sponsor to lower, or relocate proposed structures that exceed obstruction standards and have been identified by the military as detrimental to their training requirement.

**5.** Radar Bomb Sites (RBS) − These sites are a vital link in the low level training network used by the

U.S. Air Force to evaluate bomber crew proficiency. They provide accurate radar records for aircraft flying at low altitudes attacking simulated targets along the RBS scoring line. An obstruction located within the flights' RBS boundaries may have a substantial adverse effect and a serious operational impact on military training capability.

**e.** TERMINAL AREA IFR OPERATIONS. The obstruction standards contained in Part 77 are also used to identify obstructions within terminal obstacle clearance areas. Any structure identified as an obstruction is considered to have an adverse effect; however, there is no clear−cut formula to determine what extent of adverse effect is considered substantial. Instrument approach and departure procedures are established in accordance with published obstacle clearance guidelines and criteria. However, there are segments of instrument approach procedures where the minimum altitudes may be revised without substantially effecting landing minimums. Thus, the determination must represent a decision based on the best facts that can be obtained during the aeronautical study.

**1.** Standard Instrument Approach Procedures (SIAP)/Special IAP. IFP Service Providers are responsible for evaluating the effect of structures upon any segment of, or departure restriction associated with, any FAA approved procedure they maintain. However, all personnel involved in the obstruction evaluation process should be familiar with all aspects of the terminal area IFR operations being considered. If any IFP Service Provider determines a structure will affect instrument flight procedures, their evaluation should include those procedural adjustments that can be made without adversely affecting IFR operations. When the study discloses that procedural adjustments to reduce or mitigate any adverse effect cannot be accomplished, then the comments to OEG must identify the significance of this effect on the procedure.

*NOTE−*
*This paragraph applies to any SIAP and Special IAP at public−use and private−use airports.*

**2.** Minimum Vectoring Altitudes (MVA). These altitudes are based upon obstruction clearance requirements only (see Order 8260.19). The area considered for obstacle clearance is the normal operational use of the radar without regard to the flight−checked radar coverage. It is the responsibility of individual controllers to determine that a target

return is adequate for radar control purposes. MVAs are developed by terminal facilities, approved by the Terminal Procedures and Charting Group and published for controllers on MVA Sector Charts. Any structure that would cause an increase in an MVA is an obstruction and a study is required to determine the extent of adverse effect. Radar coverage adequate to vector around such a structure is not, of itself, sufficient to mitigate a finding of substantial adverse effect that would otherwise be the basis for a determination of hazard to air navigation.

**3.** Military Airports. With the exception of the U.S. Army, the appropriate military commands establish and approve terminal instrument procedures for airports under their respective jurisdictions. Consequently, the OEG must ensure that the military organizations are provided the opportunity to evaluate a structure that may affect their operations. While the military has the responsibility for determining the effect of a structure, it is expected that the FPT will assist air traffic in reconciling differences in the military findings.

**4.** Departure Procedures. TERPS, Chapter 12, Civil Utilization of Area Navigation (RNAV) Departure Procedures, contains criteria for the development of IFR departure procedures. An obstacle that penetrates the 40:1 departure slope is considered to be an obstruction to air navigation. Further study is required to determine if adverse effect exists. Any proposed obstacle that penetrates the 40:1 departure slope, originating at the departure end of runway (DER) by up to 35 feet will be circularized. If an obstacle penetrates the 40:1 departure slope by more than 35 feet, it is presumed to be a hazard, and a Notice of Presumed Hazard will be issued, and processed accordingly. Analysis by the Terminal Procedures and Charting Group and air traffic personnel is necessary to determine if there would be a substantial adverse effect on the navigable airspace.

**5.** Minimum Safe Altitudes (MSA). A MSA is the minimum obstacle clearance altitude for emergency use within a specified distance from the navigation facility upon which a procedure is predicated. These are either Minimum Sector Altitudes, established for all procedures within a 25−mile radius of the navigational facility (may be increased to 30 miles under certain conditions), or Emergency Safe Altitudes, established within a 100−mile radius of the navigation facility and normally used only in military procedures at the option of the approval authority. These altitudes are designed for emergency use only and are not routinely used by pilots or by air traffic control. Consequently, they are not considered a factor in determining the extent of adverse effect, used as the basis of a determination, or addressed in the public notice of an aeronautical study.

**f.** CONSIDERING ACCURACY. Experience has shown that submissions often contain elevation and/or location errors. For this reason, the IFP Service Providers use vertical and horizontal accuracy adjustments, as reflected below, to determine the effect on IFR operations.

**1.** Accuracy Application − Current directives require the IFP Service Provider to apply accuracy standards to obstacles when evaluating effects on instrument procedures. These accuracy standards typically require an adjustment of 50 feet vertically and 250 feet horizontally to be applied in the most critical direction. Normally, these adjustments are applied to those structures that may become the controlling obstructions and are applicable until their elevation and location are verified by survey.

**2.** Certified Accuracy − The IFP Service Provider must notify OEG whenever certified accuracy would lessen the adverse effect upon IFR procedures. The OEG will review and determine whether to request a surveyed verification of the elevation and location. The acceptable accuracy verification method must be provided and certified by a licensed engineer or surveyor. The survey must include the plus or minus accuracy required, as well as the signature of the engineer/surveyor and the appropriate seal.

**3.** Determination − A final determination based on improved accuracy must not be issued until after the certified survey is received and evaluated by the OEG.

**4.** Survey Information Distribution − When the certified survey is received, OEG personnel must ensure that the survey information is uploaded into the OE/AAA system and change the accuracy code within the study as appropriate.

Addendum 36

Case: 21-71426, 07/13/2022, ID: 12493427, DktEntry: 19, Page 92 of 103

### 6−3−10. EVALUATING EFFECT ON AIR NAVIGATION AND COMMUNICATION FACILITIES

**a.** The FAA is authorized to establish, operate, and maintain air navigation and communications facilities and to protect such facilities from interference. During the evaluation of structures, factors that may adversely affect any portion or component of the NAS must be considered. Since an electromagnetic interference potential may create adverse effects as serious as those caused by a physical penetration of the airspace by a structure, those effects must be identified and stated. Proposals will be handled, when appropriate, directly with FCC through Technical Operations Spectrum Engineering Services Group/Spectrum Assignment and Engineering Team.

**b.** Technical operations services personnel must evaluate notices to determine if the structure will affect the performance of existing or proposed NAS facilities. The study must also include any plans for future facilities, proposed airports, or improvements to existing airports.

**c.** The physical presence of a structure and/or the electromagnetic signals emanating or reflecting there from may have a substantial adverse effect on the availability, or quality of navigational and communications signals, or on air traffic services needed for the safe operation of aircraft. The following general guidelines are provided to assist in determining the anticipated interference.

**1.** Instrument Landing System (ILS) − Transmitting antennas are potential sources of electromagnetic interference that may effect the operation of aircraft using an ILS facility. The antenna height, radiation pattern, operating frequency, effective radiated power (ERP), and its proximity to the runway centerline are all factors contributing to the possibility of interference. Normally, any structure supporting a transmitting antenna within the established localizer and/or glide−slope service volume area must be studied carefully. However, extremes in structure height, ERP, frequency, and/or antenna radiation pattern may require careful study of structures up to 30 NM from the ILS frequency's protected service volume area.

**(a)** ILS Localizer. Large mass structures adjacent to the localizer course and/or antenna array are potential sources of reflections and/or re−radiation that may affect facility operation. The shape and intensity of such reflections and/or re−radiation depends upon the size of the reflecting surface and distance from the localizer antenna. The angle of incidence reflection in the azimuth plane generally follows the rules of basic optical reflection. Normally, in order to affect the course, the reflections must come from structures that lie in or near the on−course signal. Large mass structures of any type, including metallic fences or powerlines, within plus/minus 15 degrees of extended centerline up to 1 NM from the approach end of the runway and any obstruction within 500 feet of the localizer antenna array must be studied carefully. (Refer to FAA Order 6750.16, Siting Criteria for Instrument Landing Systems).

**(b)** ILS Glide Slope. Vertical surfaces within approximately 1,000 feet of the runway centerline and located up to 3,000 feet forward of the glide slope antenna can cause harmful reflections. Most interference to the glide slope are caused by discontinuities in the ground surface, described approximately as a rectangular area 1,000 feet wide by 5,000 feet long, extending forward from the glide slope antenna and centered at about the runway centerline. Discontinuities are usually in the form of rough terrain or buildings (refer to FAA Order 6750.16, Siting Criteria for Instrument Landing Systems).

**2.** Very High Frequency Omni−Directional Radio Range and Tactical Air Navigation Aid (VOR/TACAN). Usually, there should be no reflecting structures or heavy vegetation (trees, brush, etc.) within a 1,000 foot radius of the VOR or the TACAN antenna. Interference may occur from large structures or powerlines up to 2 NM from the antenna. Wind turbines are a special case, in that they may cause interference up to 8 NM from the antenna. (Refer to FAA Order 6820.10, VOR, VOR/DME, and TACAN Siting Criteria).

**3.** Air Route Surveillance Radar/Airport Surveillance Radar (ARSR/ASR). Normally, there should be no reflecting structures within a 1,500−foot radius of the radar antenna. In addition, large reflective structures up to 3 NM from the antenna can cause interference unless they are in the "shadow" of topographic features. Wind turbines are a special

Addendum 37

case, in that they may cause interference up to the limits of the radar line of site.

**4.** Air Traffic Control Radar Beacon (ATCRB). The effects encountered due to reflections of the secondary radar main lobe are more serious than those associated with primary radar. Therefore, it is necessary to ensure that no large vertical reflecting surface penetrates a 1,500–foot radius horizontal plane located 25 feet below the antenna platform. In addition, interference may occur from large structures up to 12 miles away from the antenna. This distance will depend on the area of the reflecting surface, the reflection coefficient of the surface, and its elevation with respect to the interrogator antenna. (Refer to FAA Order 6310.6, Primary/Secondary Terminal Radar Siting Handbook).

**5.** Directional Finder (DF). The DF antenna site should be free of structures that will obstruct line–of–sight with aircraft at low altitudes. The vicinity within 300 feet of the antenna should be free of metallic structures which can act as re–radiators.

**6.** Communication Facilities. Minimum desirable distances to prevent interference problems between communication facilities and other construction are:

**(a)** 1,000 feet from power transmission lines (other than those serving the facility) and other radio or radar facilities.

**(b)** 300 feet from areas of high vehicle activity such as highways, busy roads, and large parking areas.

**(c)** One (1) NM from commercial broadcasting stations (e.g., FM, TV).

**7.** Approach Lighting System. No structure, except the localizer antenna, the localizer far field monitor antenna, or the marker antenna must protrude above the approach light plane. For approach light plane clearance purposes, all roads, highways, vehicle parking areas, and railroads must be considered as vertical solid structures. The clearance required above interstate highways is 17 feet; above railroads, 23 feet; and for all other public roads, highways, and vehicle parking areas, 15 feet. The clearance required for a private road is 10 feet or the highest mobile structure that would normally use the road, which would exceed 10 feet. The clearance for roads and highways must be measured from the

crown of the road; the clearance for railroads must be measured from the top of the rails. For vehicle parking areas, clearance must be measured from the average grade in the vicinity of the highest point. Relative to airport service roads substantial adverse effect can be eliminated if all vehicular traffic is controlled or managed by the air traffic control facility. A clear line–of–sight is required to all lights in the system from any point on a surface, one–half degree below the aircraft descent path and extending 250 feet each side of the runway centerline, up to 1,600 feet in advance of the outermost light in the system. The effect of parked or taxiing aircraft must also be considered when evaluating line–of–sight for approach lighting systems.

**8.** Visual Approach Slope Indicator (VASI)/Precision Approach Path Indicator (PAPI). No structures or obstructions must be placed within the clearance zone for the particular site involved or the projected visual glide path.

*NOTE–*
*VASI and PAPA now fall under the heading of VGSI.*

**9.** Runway End Identifier Lights (REIL). No structures or obstructions must be placed within the established clearance zone.

**d.** Factors that modify the evaluation criteria guidelines require consideration. Some facility signal areas are more susceptible to interference than others. The operational status of some signals may already be marginal because of existing interference from other structures. In addition, the following characteristics of structures must be considered:

**1.** The higher the structure's height is in relation to the antenna, the greater the chance of interfering reflections. Any structure subtending a vertical angle greater than one degree from the facility is usually cause for concern. Tall structures, such as radio towers and grain elevators, can interfere from distances greater than those listed in the general criteria.

**2.** The type of construction material on the reflecting surface of the structure is a factor, with nonmetallic surfaces being less troublesome than metallic or metallic impregnated glass.

**3.** Aircraft hangars with large doors can be a special problem because the reflecting surface of the hangar varies appreciably with changes in the position of the doors.

Addendum 38

**4.** Interference is usually caused by mirror reflections from surfaces on the structure. Orientation of the structure therefore plays an important part in the extent of the interference. Reflections of the largest amplitude will come from signals striking a surface perpendicular to the signals. Signals striking a surface at a shallow angle will have a smaller amplitude.

**e.** Air traffic personnel must request technical operations services personnel to assist them in discussions with sponsors to explore alternatives to resolve the prospective adverse effects to facilities. These may involve design revisions, relocation, or reorientation depending on the character of the construction and facility involved.

**f.** Attempt to resolve electromagnetic interference (EMI) before issuing a hazard determination. Notify the sponsor by letter (automated DPH letter) that the structure may create harmful EMI and include in the letter the formula and values that were applied, the specific adverse effects expected, and an offer to consider alternatives. Provide the sponsor, as well as the FAA, ample time to exhaust all available avenues for positive resolution. The intent of this process is to allow the sponsor adequate time to consider the problems and the alternatives before a decision is rendered by the issuance of the FAA determination. Follow these guidelines in all situations where harmful EMI is projected by the study.

## 6–3–11. EVALUATING PLANNED OR FUTURE AIRPORT DEVELOPMENT PROGRAMS

The national system of airports consists of public, civil, and joint–use airport facilities considered necessary to adequately meet the anticipated needs of civil aeronautics. Airport Planning and Programming Offices are the most accurate sources of up–to–date information on airport development plans. Consequently, Airports personnel are expected to extensively review structures in reference to the safe and orderly development of airport facilities, including what development will realistically be accomplished within a reasonable time. Areas of consideration in accomplishing this responsibility are:

**a.** Future Development of Existing Airports. A detailed review in this area requires looking at current planned airport projects, national airport plan data, and land–use planning studies in the vicinity of the structure. The results of the study forwarded to air traffic must include appropriate comments regarding the extent of Federal aid, sponsor airport investments, the airport owner's obligations in existing grant–in–aid agreements, and anticipated aeronautical activity at the airport and in the general area. If a structure would adversely impact an airport's efficiency, utility, or capacity, the responsible Airports Office should document this impact in its evaluation. Comments should include recommended new location(s) for the structure as appropriate.

**b.** New Airport Development. When a structure requiring notice under Part 77 and any new airport development are both in the same vicinity, Airports personnel must study the interrelationship of the structure and the airport. Additionally, supplemental information on the proposed airport site must be furnished to the OEG. If a substantial adverse effect is anticipated, Airports personnel must provide detailed comments and specific recommendations for mitigating the adverse effects.

## 6–3–12. EVALUATING TEMPORARY CONSTRUCTION

**a.** Temporary Construction Equipment. Construction of structures normally requires use of temporary construction equipment that is of a greater height than the proposed structure. Appropriate action is necessary to ensure that the temporary construction equipment does not present a hazard to air navigation. It is not possible to set forth criteria applicable to every situation; however, the following action examples may help to minimize potential problems:

**1.** If use of the temporary construction equipment is on an airport, it may be necessary to negotiate with airport managers/owners to close a runway, taxiway, temporarily move a runway threshold, or take other similar action.

**2.** Negotiate with equipment operators to raise and lower cranes, derricks, or other construction equipment when weather conditions go below predetermined minimums as necessary for air traffic operations or as appropriate for the airport runways in use.

**3.** Control the movement of construction vehicle traffic on airports.

**4.** Adjust minimum IFR altitudes or instrument procedures as necessary to accommodate the construction equipment if such action will not have serious adverse effects on aeronautical operations.

**5.** Request that the temporary construction equipment be properly marked and/or lighted if needed.

**b.** Temporary Structures – OE notices for temporary structures are processed in the same manner as a permanent structure, but require special consideration in determining the extent of adverse effect. This is especially true of structures such as cranes and derricks that may only be at a particular site for a short time period. As a general policy, it is considered in the public interest to make whatever adjustments necessary to accommodate the temporary structure of 30 days or less if there is no substantial adverse affect on aeronautical operations or procedures. However, this policy does not apply if the aeronautical study discloses that the structure would be a hazard to aviation. Reasonable adjustments in aeronautical operations and modifications to the temporary structure should be given equal consideration.

## 6–3–13. CONSIDERING SHIELDING

Shielding as described below should not be confused with notice criteria as stated in Section 77.9(e).

**a.** Consideration. Shielding is one of many factors that must be considered in determining the physical effect a structure may have upon aeronautical operations and procedures. Good judgment, in addition to the circumstances of location and flight activity, will influence how this factor is considered in determining whether proposed or existing structures would be physically shielded.

**b.** Principle. The basic principle in applying the shielding guidelines is whether the location and height of the structures are such that aircraft, when operating with due regard for the shielding structure, would not collide with that structure.

**c.** Limitations. Application of the shielding effect is limited to:

**1.** The physical protection provided by existing natural terrain, topographic features, or surface structures of equal or greater height than the structure under study; and

**2.** The structure(s) providing the shielding protection is/are of a permanent nature and there are no plans on file with the FAA for the removal or alteration of the structure(s).

**d.** Guidelines. Any proposed construction of or alteration to an existing structure is normally considered to be physically shielded by one or more existing permanent structure(s), natural terrain, or topographic feature(s) of equal or greater height if the structure under consideration is located:

**1.** Not more than 500 feet horizontal distance from the shielding structure(s) and in the congested area of a city, town, or settlement, provided the shielded structure is not located closer than the shielding structures to any heliport or airport located within 5 miles of the structure(s).

**2.** Such that there would be at least one such shielding structure situated on at least three sides of the shielded structure at a horizontal distance of not more than 500 feet.

**3.** Within the lateral dimensions of any runway approach surface but would not exceed an overall height above the established airport elevation greater than that of the outer extremity of the approach surface, and located within, but would not penetrate, the shadow plane(s) of the shielding structure(s).

**e.** OEG must coordinate with FPT before applying shielding criteria for precision approach surface penetrations.

NOTE−
*See FIG 6−3−7 and FIG 6−3−12.*

## 6–3–14. CONSIDERING SHADOW PLANE

The term "shadow plane" means a surface originating at a horizontal line passing through the top of the shielding structure at right angles to a straight line extending from the top of the shielding structure to the end of the runway. The shadow plane has a width equal to the projection of the shielding structure's width onto a plane normal to the line extending from the top and center of the shielding structure to the midpoint of the runway end. The shadow plane extends horizontally outward away from the shielding structure until it intersects or reaches the end of one of the imaginary approach area surfaces; see FIG 6−3−13, FIG 6−3−14, and FIG 6−3−15.

Addendum 40

## 6–3–15. RECOMMENDING MARKING AND LIGHTING OF STRUCTURES

**a.** STANDARDS. FAA standards, procedures, and types of equipment specified for marking and lighting structures are presented in AC 70/7460–1, Obstruction Marking and Lighting. These standards provide a uniform means to indicate the presence of structures and are the basis for recommending marking and lighting to the public. These standards are the minimum acceptable level of conspicuity to warn pilots of the presence of structures. They must also apply when Federal funds are to be expended for the marking and lighting of structures.

**b.** AERONAUTICAL STUDY. All aeronautical studies must include an evaluation to determine whether obstruction marking and/or lighting are necessary and to what extent. The entire structure or complex, including closely surrounding terrain and other structures, must be considered in recommending marking and lighting. A subsequent study may indicate a need to change an earlier determination by recommending marking and/or lighting when such recommendation was not made in the original study or, in some cases, after a determination was issued.

**1.** Proposed Structures. A change in runway length or alignment, a new airport development project, a change in aeronautical procedures, or other similar reasons may be cause for additional study of proposed structures to determine whether marking and/or lighting are now appropriate even when not recommended in the original study.

**2.** Existing Structures. A marking and/or lighting recommendation may be made at any time. In making the recommendation consider changes that have occurred in the vicinity of the structure since the initial determination was made and include such factors as increased aircraft activity, the closing of an airport, changes in IFR and VFR routes, and shielding by taller structures.

**c.** RECOMMENDATIONS. Recommend the marking and/or lighting standard most appropriate for the height and location of any temporary or permanent structure that:

**1.** Exceeds 200 feet in overall height above ground level at its site or exceeds any obstruction standard contained in Part 77, Subpart C, unless an aeronautical study shows the absence of such

marking and/or lighting will not impair aviation safety.

**2.** Is not more than 200 feet AGL, or is not identified as an obstruction under the standards of Part 77, Subpart C, but may indicate by its particular location a need to be marked or lighted to promote aviation safety.

**d.** PARTIAL MARKING AND/OR LIGHTING. Omitting marking and/or lighting on the structure's bottom section; for example, the lowest 200 feet of a tall structure should be discouraged unless that part of the structure is shielded. Marking and lighting standards are based on a total system configuration and are only effective when used as intended. Therefore, the structure and its location must be given careful consideration before recommending partial marking and/or lighting.

**e.** OMISSION/DELETION OF MARKING AND/OR LIGHTING. When recommending that marking and/or lighting be omitted because the structure is sufficiently conspicuous by its shape, size, and/or color, include a judgment that the structure would not blend into any physical or atmospheric background that may reasonably be expected in the vicinity.

**f.** EXCESSIVE MARKING AND/OR LIGHTING. Recommend specific advisory circular chapters, paragraphs, and, when appropriate, specific intensities that address the minimum marking and/or lighting standards for safety. Recommendation of specific chapters allow for the use of those chapters only, although they may contain references to other chapters. If the sponsor insists on or the FAA finds that high intensity white lights would not be objectionable, indicate in the determination that the FAA does not object to increased conspicuity provided the lighting is in accordance with guidelines of AC 70/7460–1, Obstruction Marking and Lighting.

**g.** VOLUNTARY MARKING AND/OR LIGHTING. When it is determined not necessary for aviation safety, marking and/or lighting may be accomplished on a voluntary basis. However, marking and/or lighting should not be a condition of the determination, but instead, it must be recommended that, if voluntary, marking and/or lighting be installed and maintained in accordance with AC 70/7460–1.

**h.** HIGH AND MEDIUM INTENSITY WHITE OBSTRUCTION LIGHTING SYSTEMS:

**1.** High intensity lighting systems should not be recommended for structures 700 feet above ground level or less, except when an aeronautical study shows otherwise. This does not apply to catenary support structures.

**2.** Use caution in recommending the use of high or medium intensity white obstruction lighting systems, especially in a populated area. Aircraft operations can be adversely affected where strobe−lighted structures are located in an area of limited visual cues. These situations can contribute to spatial disorientation when pilots are maneuvering in minimum visibility conditions. Marine or surface vessels and other vehicles, especially on nearby elevated roadways, could also experience operational difficulties from strobe lights. External shielding may minimize adverse effects. Examples are:

**(a)** At locations within the airport/heliport environment in a sparsely lighted rural setting.

**(b)** At an offshore installation.

**3.** Dual lighting systems should be considered when a structure is located in or near residential areas, especially in hilly terrain where some houses are higher than the base of the structure.

**i.** LIGHTED SPHERICAL MARKERS. Lighted spherical markers are available for increased night conspicuity of high−voltage (69kv or greater) transmission−line catenary wires. These markers should be recommended for increased night conspicuity for such wires when located near airports, heliports, across rivers, canyons, lakes, etc. Consider the following when recommending lighted spherical markers: aeronautical activity, nighttime operations, low level operations, local weather conditions, height of span, length of span, etc. If the support structures are to be lighted, also consider lighting the catenary wires. Installation, size, color, and pattern guidelines can be found in Advisory Circular 70/7460−1, Obstruction Marking and Lighting.

**j.** DEVIATIONS AND MODIFICATION TO MARKING AND/OR LIGHTING. When the sponsor or owner of a structure requests permission to deviate from or modify the recommended marking and/or lighting, an appropriate aeronautical study should be made to determine whether the deviation/modification is acceptable, and/or whether the recommended marking and/or lighting should be retained.

**1.** A deviation refers to a change from the standard patterns, intensities, flashing rates, etc. A marking and lighting deviation is considered to be marking patterns or colors and lighting patterns, intensities, flashing rates, or colors other than those specified in AC 70/7460−1.

**(a)** Examples of deviations are contained in the AC 70/7460−1 and requests for deviations must be forwarded to the OEG to conduct an aeronautical study for the proposal. The results of the evaluation will be sent to the Team Manager for review.

**(b)** Deviations require final approval by the OEG Group Manager. The Team Manager will forward the results of the study to the OEG Group Manager for approval or denial and the OEG must effect all coordination necessary for issuing the decision.

**2.** The OEG may approve a request for a modified application of marking and/or lighting. Examples of modified applications may be found in AC 70/7460−1. A modified application of marking and lighting refers to the amount of standard marking and/or lighting such as:

**(a)** Placing the standard marking and/or lighting on only a portion of a structure.

**(b)** Adding marking and/or lighting in addition to the standard marking and lighting to improve the conspicuity of the structure;

**(c)** Reducing the amount of standard marking and/or lighting to the extent of eliminating one or other as may be considered appropriate.

**(d)** Adjusting the standard spacing of recommended intermediate light levels for ease of installation and maintenance as considered appropriate.

## 6−3−16. NEGOTIATIONS

Negotiations must be attempted with the sponsor to reduce the structure's height so that it does not exceed obstruction standards, mitigate any adverse effects on aeronautical operations, air navigation and/or communication facilities, or eliminate substantial adverse effect. If feasible, recommend collocation of

the structure with other structures of equal or greater heights. Include in the aeronautical study file and determination a record of all the negotiations attempted and the results. If negotiations result in the withdrawal of the OE notice, the obstruction evaluation study may be terminated. Otherwise, the obstruction evaluation must be continued to its conclusion.

## 6-3-17. CIRCULARIZATION

**a.** Circularizing a public notice allows the FAA to solicit information that may assist in determining what effect, if any, the proposed structure would have to the navigable airspace. The OEG determines when it is necessary to distribute a public notice.

**1.** If a structure first exceeds obstruction standards, then a public notice should be circularized if:

(a) An airport is affected;

(b) There is possible VFR effect; or

(c) There is a change in aeronautical operations or procedures.

**2.** Circularization is not necessary for the following types of studies:

(a) A reduction in the height of an existing structure.

(b) A structure that would be located on a site in proximity to another previously studied structure, would have no greater effect on aeronautical operations and procedures, and the basis for the determination issued under the previous study could be appropriately applied.

(c) A proposed structure replacing an existing or destroyed structure, that would be located on the same site and at the same or lower height as the original structure, and marked and/or lighted under the same provisions as the original structure (this does not preclude a recommendation for additional marking/lighting to ensure conspicuity).

(d) A proposed structure that would be in proximity to, and have no greater effect than, a previously studied existing structure, and no plan is on file with the FAA to alter or remove the existing structure.

(e) A structure that would be temporary and appropriate temporary actions could be taken to accommodate the structure without an undue hardship on aviation.

(f) A structure found to have substantial adverse effect based on an internal FAA study.

(g) A structure that would exceed Part 77.17 (a)(2) and would be outside the traffic pattern.

(h) A structure that would affect IFR operations but would only need FAA comment. For instance a structure that:

(1) Would raise a MOCA, but not a MEA.

(2) Would raise a MVA.

(3) Would raise a MIA.

**3.** Circularization for existing structures will be determined on a case–by–case basis.

**b.** Each public notice (automated letter CIR) must contain:

**1.** A complete, detailed description of the structure including, as appropriate, illustrations or graphics depicting the location of the structure:

(a) On–airport studies. Use airport layout plans or best available graphic.

(b) Off–airport studies. Use the appropriate aeronautical chart. Additional illustrations may be included, as necessary.

**2.** A complete description of the obstruction standards that are exceeded, the number of feet by which the structure exceeds the standards.

**3.** An explanation of the potential effects of the structure in sufficient detail to assist interested persons in formulating comments on how the structure would affect aeronautical operations.

**4.** A date by which comments are to be received. The date established should normally allow interested persons 30 days in which to submit comments, but a shorter comment period may be established depending upon circumstances.

**c.** Public notices should be distributed to those who can provide information needed to assist in identifying/evaluating the aeronautical effect of the structure. As a minimum, the following government-al agencies, organizations, and individuals should be included on distribution lists due to their inherent aeronautical interests:

**1.** The sponsor and/or his representative.

**2.** All known aviation interested persons and groups such as state, city, and local aviation authorities; airport authorities; various military organizations within the DOD; and other organizations or individuals that demonstrate a specific aeronautical interest through subscription to notifications. More information about subscribing to notifications regarding structures that may impact a specific airport or airspace area is available at https://oeaaa.faa.gov.

**3.** Airport owners as follows:

(a) All public−use airports within 13 NM of the structure.

(b) All private−use airports within 5 NM of the structure.

**4.** The specific FAA approach facility, en route facility (ARTCC), and Flight Service Station (FSS) in whose airspace the structure is located.

**5.** An adjacent regional/service area office if the structure is within 13 NM of the regional state boundary.

**6.** As appropriate, state and local authorities; civic groups; organizations; and individuals who do not have an aeronautical interest, but may become involved in specific aeronautical cases, must be included in the notice distribution, and given supplemental notice of actions and proceedings on a case−by−case basis. Those involved should clearly understand that the public notice is to solicit aeronautical comments concerning the physical effect of the structure on the safe and efficient use of airspace by aircraft.

**7.** A proposed structure that penetrates the 40:1 by 35 feet or more, departure slope must be circularized to the following:

(a) Aircraft Owners and Pilots Association;

(b) National Business Aviation Association;

(c) Regional Air Line Association;

(d) Department of Defense;

(e) Air Transport Association;

(f) Air Line Pilots Association; and

(g) Other appropriate persons and organizations listed in this section.

**d.** Document and place in the obstruction evaluation file the names of each person and/or organizations to which public notice was sent. Reference to a distribution code, mailing list, or other evidence of circularization is sufficient provided a printout or list of each coded distribution is maintained for future reference. Also record the time period during which each printout or list is used. The retention schedule is listed in Order 1350.15, Records Organization, Transfer, and Destruction Standards.

**e.** Consider only valid aeronautical objections or comments in determining the extent of adverse effect of the structure. Comments of a non−aeronautical nature are not considered in obstruction evaluation as described in Part 77.

**f.** If the sponsor agrees to revise the project so that it does not exceed obstruction standards and would have no adverse effect, cancel the public notice, advise interested parties, as necessary, revise the obstruction evaluation study, and proceed as appropriate.

Addendum 44

---

United States Code Annotated
   Federal Rules of Appellate Procedure (Refs & Annos)
      Title IV. Review or Enforcement of an Order of an Administrative Agency, Board, Commission, or Officer

Federal Rules of Appellate Procedure Rule 16, 28 U.S.C.A.

Rule 16. The Record on Review or Enforcement

Currentness

**(a) Composition of the Record.** The record on review or enforcement of an agency order consists of:

   **(1)** the order involved;

   **(2)** any findings or report on which it is based; and

   **(3)** the pleadings, evidence, and other parts of the proceedings before the agency.

**(b) Omissions From or Misstatements in the Record.** The parties may at any time, by stipulation, supply any omission from the record or correct a misstatement, or the court may so direct. If necessary, the court may direct that a supplemental record be prepared and filed.

**CREDIT(S)**
(As amended Apr. 24, 1998, eff. Dec. 1, 1998.)

F. R. A. P. Rule 16, 28 U.S.C.A., FRAP Rule 16
Including Amendments Received Through 7-1-22

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  United States Court of Appeals for the Ninth Circuit
    Title VII. General Provisions

U.S.Ct. of App. 9th Cir. Rule 28-2, 28 U.S.C.A.

Rule 28-2. Contents of Briefs

Effective: December 1, 2021
Currentness

In addition to the requirements of FRAP 28, briefs shall comply with the following rules:

**28-2.1. Certificate as to Interested Parties. [Abrogated]**

**28-2.2. Statement of Jurisdiction.** In a statement preceding the statement of the case in its initial brief, each party shall demonstrate the jurisdiction of the district court or agency and of this Court by stating, in the following order:

(a) The statutory basis of subject matter jurisdiction of the district court or agency;

(b) The basis for claiming that the judgment or order appealed from is final or otherwise appealable, and the statutory basis of jurisdiction of this Court.

(c) The date of entry of the judgment or order appealed from; the date of filing of the notice of appeal or petition for review; and the statute or rule under which it is claimed the appeal is timely.

If the appellee agrees with appellant's statement of one or more of the foregoing matters, it will be sufficient for the appellee to state such agreement under an appropriate heading.

**28-2.3. Attorneys Fees. [Abrogated]**

**28-2.4. Bail/Detention Status.**

(a) The opening brief in a criminal appeal shall contain a statement as to the bail status of the defendant. If the defendant is in custody, the projected release date should be included.

(b) The opening brief in a petition for review of a decision of the Board of Immigration Appeals shall state whether petitioner (1) is detained in the custody of the Department of Homeland Security or at liberty and/or (2) has moved the Board of Immigration Appeals to reopen or applied to the district director for an adjustment of status.

**28-2.5. Reviewability and Standard of Review.** As to each issue, appellant shall state where in the record on appeal the issue was raised and ruled on and identify the applicable standard of review.

In addition, if a ruling complained of on appeal is one to which a party must have objected at trial to preserve a right of review, e.g., a failure to admit or to exclude evidence or the giving of or refusal to give a jury instruction, the party shall state where in the record on appeal the objection and ruling are set forth.

**28-2.6. Statement of Related Cases.** Each party shall identify in a statement on the last page of its initial brief any known related case pending in this Court. This statement constitutes a certificate of counsel, excluded from the page and word limitations pursuant to FRAP 32(f) and Circuit Rule 32-1(c). As to each such case, the statement shall include the name and Court of Appeals docket number of the related case and describe its relationship to the case being briefed. Cases are deemed related if they:

(a) arise out of the same or consolidated cases in the district court or agency;

(b) raise the same or closely related issues; or

(c) involve the same transaction or event.

If no other cases in this Court are deemed related, no statement is required. The appellee need not include any case identified as related in the appellant's brief.

### CIRCUIT ADVISORY COMMITTEE NOTE TO RULE 28-2.6

The purpose of this rule is to alert the parties and the Court to other known cases pending in this Court that might affect how the instant case is managed or decided. This rule does not require counsel to list all known cases raising the same or closely related issues if the list would be lengthy and counsel in good faith believes that listing the cases would not assist the Court or other parties.

**28-2.7. Addendum to Briefs.**

**Statutory.** Pertinent constitutional provisions, treaties, statutes, ordinances, regulations or rules must be set forth verbatim and with appropriate citation either (1) following the statement of issues presented for review or (2) in an addendum introduced by a table of contents and bound with the brief or separately; in the latter case, a statement must appear referencing the addendum after the statement of issues. If this material is included in an addendum bound with the brief, the addendum must be separated from the body of the brief (and from any other addendum) by a distinctively colored page. A party need not resubmit material included with a previous brief or addendum; if it is not repeated, a statement must appear under this heading as follows: [e]xcept for the following, all applicable statutes, etc., are contained in the brief or addendum of _____.

**Orders Challenged in Immigration Cases.** All opening briefs filed in counseled petitions for review of immigration cases must include an addendum comprised of the orders being challenged, including any orders of the immigration court and Board of Immigration Appeals. The addendum shall be bound with the brief, both when it is filed electronically and, when ordered, in hard copies. When paper copies of the brief are ordered, the addendum shall be separated from the brief by a distinctively colored page.

### CIRCUIT ADVISORY COMMITTEE NOTE TO RULE 28-2.7

Addendum 47

The purpose of the statutory addendum is to provide the Court with convenient access to statutory or other authority that is either specifically at issue or is not already commonly known, not to provide every statute or legal authority that is cited in the brief. For example, when the parties are debating the meaning of a specific clause or portion of a statute, regulation, constitutional provision, or other legal authority, or when they are discussing authority that is not commonly cited, the addenda should include the pertinent provisions of that legal authority. (New 12/1/21)

**28-2.8. Record References.** Every assertion in the briefs regarding matters in the record, except for undisputed facts offered only for general background, shall be supported by a citation to the Excerpts of Record, unless the filer is exempt from the excerpts requirement.

### CIRCUIT ADVISORY COMMITTEE NOTE TO RULE 28-2.8

Because every record-related citation other than undisputed facts offered only for general background shall be supported by the Excerpts of Record, citations directly to the underlying record are otherwise prohibited.

**28-2.9. Bankruptcy Appeals. [Abrogated]**

**CREDIT(S)**

[Effective January 1, 1997. Amended effective January 1, 2005. Paragraph 28-2.8 adopted by the Court on an emergency basis, March 22, 2006, subject to further review and consideration by the Advisory Rules Committee. Amended effective July 1, 2007; December 1, 2009; December 1, 2019; December 1, 2020; December 1, 2021.]

<Federal Rules of Appellate Procedure also govern procedure in appeals to United States courts of appeals>

Notes of Decisions (1)

U. S. Ct. of App. 9th Cir. Rule 28-2, 28 U.S.C.A., CTA9 Rule 28-2
Including Amendments Received Through 5-1-22

© 2022 Thomson Reuters. No claim to original U.S. Government Works.